UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SANDRA COLMAN LERNER,<br><br>           Plaintiff,<br>v.<br><br>STEPHEN J. COLMAN,<br><br>           Defendant,<br>v.<br><br>DANIEL J. FLYNN III, and JAMES CANAVAN,<br><br>           Enterprise Defendants,<br>v.<br><br>LISA LaBRIQUE, ELIZABETH COLMAN, KAREN REIDY, KIRSTEN HUNT, and WILLIAM CHRISTOPHER COLMAN,<br><br>           Defendants. | CIVIL ACTION NO. |

## COMPLAINT

For almost twenty years, defendant Stephen J. Colman ("Colman" or "Defendant") was part of a criminal enterprise with Daniel J. Flynn, III ("Flynn") and James F. Canavan ("Canavan") (collectively the "Enterprise Defendants") that engaged in a series of fraudulent schemes under which they wrongfully diverted monies and assets from unsuspecting third parties in order to enrich themselves and others. These fraudulent schemes were perpetrated by Colman and Canavan, both of whom were and are members of the Massachusetts Bar and practicing attorneys, and Flynn, who operated a real estate and investment business as well as being a high-profile auctioneer in Massachusetts. In 2017, Flynn plead guilty to nine federal fraud charges

2255202_1

and is presently in prison serving a four-year sentence while Colman and Canavan continue to operate ostensibly as Massachusetts attorneys.

Plaintiff Sandra Colman Lerner ("Colman Lerner" or "Plaintiff") is a cousin of Colman and the latest victim to discover that the enterprise consisting of Colman, Canavan and Flynn conspired to and did in fact take control of over fifty percent of the shares of stock in Solar Resources, Inc. ("Solar Resources"), a Utah corporation that was founded, operated and owned by Colman Lerner and Colman's deceased uncle William J. Colman ("Bill Colman" or "Uncle Bill"). At or about the time of Bill Colman's death, Colman transferred over fifty-percent of the stock in Solar Resources to himself, his siblings, Bill Colman's then ex-wife, and Flynn and Canavan as members of the enterprise. Colman used his position as a Massachusetts attorney and nephew of Bill Colman to orchestrate this scheme and become the personal representative of Bill Colman's estate. As a result of defendants' wrongful conduct, Colman Lerner and the remaining heirs to Bill Colman's estate received a fraction of their inheritance. Colman intentionally concealed his actions from Colman Lerner, who did not discover the unscrupulous scheme until the summer of 2018.

Colman Lerner now brings this action seeking money damages for Colman and the Enterprise Defendants' violations of 18 U.S.C. § 1962(a),(b) and (c) ("Racketeering Influenced Corrupt Organizations Act" or "RICO") and against Colman for breaches of his fiduciary duties and fraud. The facts relating to the enterprise and the schemes perpetrated by Colman and the Enterprise Defendants are set forth below. Colman Lerner seeks to recover the monies and assets that Colman and the Enterprise Defendants wrongfully diverted from the estate of Bill Colman as well as treble damages and her attorneys' fees, costs and expenses incurred in this action pursuant to 18 U.S.C. § 1964(c).

2255202_1

## PARTIES

1.      Plaintiff Sandra Colman Lerner is an individual who resides in Quincy, Massachusetts.

2.      Defendant Stephen J. Colman is an individual who resides in Norwell, Massachusetts.  Colman is and has been an attorney licensed to practice law in Massachusetts since 1990.

3.      Enterprise Defendant Daniel J. Flynn III is an individual who is incarcerated in federal prison.  He is serving a four-year sentence, which will be followed by three years of supervised released.  Prior to his incarceration, Flynn resided in Milton, Massachusetts.

4.      Enterprise Defendant James F. Canavan is an individual who resides in Cohasset, Massachusetts.  Canavan is and has been an attorney licensed to practice law in Massachusetts since 1990.

5.      Defendant Lisa LaBrique is an individual who resides in North Andover, Massachusetts.

6.      Defendant Elizabeth Colman is an individual who resides in New Hampshire.

7.      Defendant Karen Reidy is an individual who resides in Chelmsford, Massachusetts.

8.      Defendant Kirsten Hunt is an individual who resides in Texas, and who maintains residence in Acton, Massachusetts.

9.      Defendant William Christopher Colman ("Chris Colman") is an individual who resides in Squantum, Massachusetts.

10.     Each of the non-enterprise defendants is a sibling of defendant Stephen Colman.

3

## JURISDICTION AND VENUE

11.     This is a RICO action conferring this Court subject matter jurisdiction pursuant to RICO's civil suit provision, 18 U.S.C. § 1964(c).  This Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331.  The amount in controversy is greater than $75,000.

12.     Venue in this District is proper because the events giving rise to this action occurred in Massachusetts, and the Plaintiff and Enterprise Defendants reside in Massachusetts.

## FACTS

### Bill Colman's Estate and Heirs at Law

13.     Bill Colman died without a will on December 11, 2011.  At the time of his death Bill Colman had no children and no spouse.

14.     Bill Colman had three siblings, all of whom pre-deceased him: Roy Colman, Robert Colman, and Marion Collins.

15.     Roy Colman and had six children: Defendant Stephen Colman, Lisa LaBrique, Elizabeth Colman, Karen Reidy, Kirsten Hunt and Chris Colman.

16.     Robert Colman had three children: Plaintiff Sandra Colman Lerner, Roberta Colman  (now deceased) and Robert Colman (now deceased).

17.      Marion Collins had three children: Thomas Collins, Mary Patricia Greene and Jack Collins.

18.     Bill Colman's twelve nieces and nephews are his heirs-at-law.

19.     Of all of Bill Colman's nieces and nephews, Colman Lerner was the closest to Uncle Bill.  Colman Lerner visited Bill Colman and his ex-wife Phyllis Colman (now deceased) on Martha's Vineyard every summer and spoke with him frequently on the phone.

20.     Stephen Colman and his siblings were not close to Bill Colman.  Although Stephen Colman did some legal work for Bill Colman, they did not have a close personal relationship.  Bill Colman told Colman Lerner that Chris Colman called him from time to time, but that he stopped taking his calls because he did not enjoy their conversations.

21.     During one of her visits with Uncle Bill and Phyllis Colman on Martha's Vineyard in the spring of 2010, Bill Colman asked Colman Lerner about Stephen Colman's law practice.  Colman Lerner informed Uncle Bill that she believed that Stephen Colman worked exclusively for Flynn.  Bill Colman did not know Flynn nor had he heard of him.  Bill Colman also told Colman Lerner that he had a "falling out" with Stephen Colman because he failed to do something he said he would do and that Stephen Colman was "no businessman."

22.     When Bill Colman discovered he was sick in early 2011, he moved to Martha's Vineyard.  Bill Colman spent the last eight months of his life on Martha's Vineyard.

23.     In June 2011, about six months before he died, Colman Lerner visited Bill Colman on Martha's Vineyard where they had a conversation about his health and the fact that he believed that he was broke.

24.     At that time, Bill Colman told Colman Lerner that he had very little money, telling her, for example, that he did not have enough money to purchase a used car and that he was on a waiting list for a subsidized assisted living facility.

25.     Prior to his death, Bill Colman was hospitalized on Martha's Vineyard and had a difficult time communicating.

26.     Bill Colman died on December 11, 2011 on Martha's Vineyard.

27.     Upon Bill Colman's death, Stephen Colman volunteered to be the personal representative of Bill Colman.

2255202_1

28.     In that role, Stephen Colman assumed sole and complete control of the estate.

29.     Stephen Colman was responsible for gathering and assuming control of Bill Colman's assets, settling his liabilities, and distributing the assets among the heirs.

30.     Bill Colman's estate consisted primarily of the business he founded in 2003, Solar Resources, Inc. ("Solar Resources").

31.     Colman Lerner and the other heirs were wholly dependent upon and trusted Stephen Colman for the management of Bill Colman's estate.  Stephen Colman was the only attorney among the heirs, a fact which he knew and of which he used to his advantage.

32.     In his capacity as personal representative of the estate, Stephen Colman owed a fiduciary duty to the estate and to each of Bill Colman's heirs, including Colman Lerner.

33.     By the laws of intestacy, each of Bill Colman's nieces and nephews received an equal share of Bill Colman's estate, amounting to approximately $362,000.00, primarily from the proceeds of the sale of Bill Colman's business, Solar Resources.

34.     As is set forth more fully below, Colman and the Enterprise Defendants orchestrated a fraudulent scheme which resulted in over 50% of the shares of stock in Solar Resources being transferred to Colman, his siblings, Bill Colman's ex-wife and Flynn and Canavan as the Enterprise Defendants.  This scheme was one of a number of fraudulent schemes carried out by an enterprise consisting of Colman, Flynn and Canavan.

### Nature of the Proceeding:  The Enterprise

35.     Colman, Canavan and Flynn have known each other since high school.

36.     Colman and Canavan were each admitted to the Massachusetts Bar in 1990 and have been members of the Bar since that time.

6

37.     Flynn is a graduate of Boston College and has been in the real estate and investment business at all relevant times.  Flynn has also been a high profile auctioneer for public charities and other organizations in Massachusetts.

38.     From approximately 1995 to sometime in 2014, Colman worked as general counsel for Flynn and his company Daniel J. Flynn & Co. ("DJFCO")

39.     At all relevant times, Flynn and DJFCO conducted business out of the property located at 1495 Hancock Street, Quincy, Massachusetts.

40.     From at least 2008 until approximately 2014, Colman's office was located at 1495 Hancock Street, Quincy, Massachusetts.

41.     Canavan's law office was also located at 1495 Hancock Street, Quincy, Massachusetts during the same approximate time period as Colman.

42.     Together, Colman, Flynn and Canavan operated a criminal enterprise (the "Enterprise") in which they participated in a series of fraudulent schemes to divert monies and assets from third parties in order to enrich themselves and others working with them.

43.     On September 23, 2015, Flynn was indicted in the United States District Court for the District of Massachusetts for wire fraud and mail fraud (the "Indictment") and the Government also sought asset forfeiture of the proceeds derived from such violations.

44.     On February 1, 2017, Flynn pleaded guilty to all nine charges in the Indictment, stemming from a series of fraudulent schemes commencing at least as early as 2007 and continuing until his Indictment in 2015.  As part of his guilty plea, Flynn agreed to provide restitution to 73 victims for a total amount over $20 million.  Flynn is currently serving a four-year sentence.

2255202_1

45.     The fraudulent schemes were conducted by Colman, Flynn and Canavan who collectively made up the Enterprise.

46.     Colman's role in the Enterprise was serving as Flynn's general counsel purporting to handle certain legal matters.

47.     Canavan's role in the Enterprise was also serving as a lawyer purporting to handle certain legal matters for the Enterprise.

48.     In reality, Flynn, Colman and Canavan conducted a series of transactions in which they collectively diverted and misappropriated monies and assets belonging to third parties.

49.     The particular fraudulent schemes conducted by Colman, Canavan and Flynn as the Enterprise include, but are not limited to (1) the DJF Real Estate Opportunity Fund scheme; (2) the Greenleaf Property scheme; (3) the East Howard Street Property scheme; (4) the Patriot Investments scheme; and (5) the Solar Resources scheme.

50.     Plaintiff Colman Lerner in this action seeks recovery for the Solar Resources scheme which directly caused her and others to suffer financial damages.  Certain of the other schemes are plead as predicate acts committed by Colman and the Enterprise Defendants.

## DJF Real Estate Opportunity Fund Scheme

51.     In November 2007, Flynn formed DJF Real Estate Opportunity Fund 1, L.P. (the "Fund") as a private investment fund with an individual, Alec Petro ("Petro"), who Flynn recruited to serve as a general partner to the Fund.  Petro and Flynn were to each contribute $1 million to the Fund.  The Fund's executive summary in its "Private Placement Memorandum" dated April 16, 2007, described the Fund as "a newly-formed private investment fund that will make opportunistic investment in commercial and residential real estate."  The executive summary further stated that the "Fund's primary focus is expected to be commercial and multi-

8

family residential real estate or loans secured by such real estate." The executive summary further described the "target investments" as "opportunistic or undervalued properties that can be acquired by the Fund with an equity investment of $500,000 to $5 million." The executive summary further stated that the Fund had been involved in 17 prior real estate investments totaling over $21 million that had generated an internal rate of return of over 203 percent.

52.    In January 2008, Flynn and Colman drafted and caused individual subscription agreements to be sent to 25 individuals who had agreed to be limited partners in the Fund in Massachusetts, New York, New Jersey, California, and elsewhere. The limited partners invested between $50,000 and $500,000. In the cover letter accompanying the subscription agreements dated January 14, 2008, Flynn represented that as of January 4, 2008, the Fund had over "8.5 million [dollars] in committed capital."

53.    Between April 2010 and continuing until April 2012, Flynn and Colman prepared periodic updates to the Fund's limited partners. The updates were signed by Flynn and Petro, although Petro had no role in drafting the updates. The updates purported to indicate what the Fund had paid for specific pieces of property and provided a fair market value. The updates were provided to the investors in the form of letters that were either mailed or emailed to the limited partners. The emails were routed over the internet through servers outside of Massachusetts.

54.    Flynn and Colman prepared an "Investment Summaries" schedule that was sent to the limited partners. The Investment Summaries listed seven different investment properties and nine outstanding promissory notes. The promissory notes, purportedly representing debts that were owed to the Fund, were listed as having a combined value of over $2.3 million. These

9

promissory notes were represented in the updates that were e-mailed to investors, including an update emailed on April 12, 2012.

55.    The nine promissory notes were fraudulent and did not represent legitimate debts owed to the Fund.

56.    Upon information and belief, Colman and/or Canavan drafted the false promissory notes and forged the signatures on the notes.

57.    Eventually, Flynn informed Petro that the promissory notes were false. Many of the limited partners filed suit against Flynn and DJFCO alleging a combined loss of more than $9 million.  On or about December 21, 2014, Petro committed suicide.

### The Greenleaf Property Scheme

58.    Colman, Flynn and Canavan engaged in a fraudulent scheme where they used the same property to entice different investors to loan or invest monies.  Under this scheme and others, Flynn served as the "front man" to seek financing and investors for alleged undervalued properties.  Colman, as in-house counsel to DJFCO and Flynn, drafted promissory notes, purchase and sale agreements and other legal documents, and Canavan conducted, among other things, residential real estate work and closings.

59.    In or about April 2005, Flynn purchased a building located at Greenleaf Street, Quincy Massachusetts (the "Greenleaf Property") for approximately $995,000.

60.    In July 2008, Colman and Flynn caused the Fund to purchase the Greenleaf Property from Flynn for approximately $2.2 million through an entity called "86 Greenleaf, LLC."  In a periodic update, Flynn listed the Greenleaf Property as one of the Fund's most significant assets.

61.     On September 14, 2010, Greenleaf, LLC sold Unit 203 of Greenleaf Place Condominium to Stephen Marcus, as trustee of the Quincy Center Realty Trust for $217,000. Canavan notarized the condominium unit deed.

62.     In or around February 2011, Flynn induced Geoffrey Caraboolad to loan the Fund $750,000 in two separate notes that Flynn said would be used to develop the Greenleaf Property, which was already owned by the Fund. Colman drafted the loan documents. In the promissory notes drafted by Colman, the Fund promised to repay the loan plus interest, and Flynn represented to Caraboolad that he would record Caraboolad's mortgage on the property at the Registry of Deeds in Norfolk County. The mortgage was not recorded at that time.

63.     On March 21, 2011, Flynn and Colman transferred title to the Greenleaf Property from Greenleaf, LLC to an entity they created called Greenleaf Condominium, LLC. The same day, Flynn granted a mortgage for the Greenleaf Property in the amount of $1.15 million to an unrelated party named TDC Secured Strategies, LLC ("TDC"). After that transaction, Flynn recorded Caraboolad's mortgage. Caraboolad was never repaid and filed suit against Flynn. Caraboolad's Complaint alleges that "Flynn's attorney" prepared the loan documents related to his promissory notes.

64.     On August 27, 2011, Greenleaf Condominium, LLC sold Unit 301 of Greenleaf Place Condominium to Yee Ting Wong for $238,000. Colman notarized the condominium unit deed.

65.     In January 2012, Flynn convinced several other individuals to loan money ostensibly for the purchase of the Greenleaf Property, which the Fund already both owned, and had sold some of its units. One of those individuals was Jay Derenzo ("Derenzo"), who loaned Flynn $100,000 in exchange for a promissory note and a guaranty, both of which were drafted by

11

Colman as "Flynn's attorney." Flynn failed to repay the note, and Derenzo filed a lawsuit against Flynn on September 14, 2012.

66.     In January 2012, Flynn induced three other individuals, Walter McDonough ("McDonough"), Kevin Carroll ("Carroll"), and Peter Higgins ("Higgins") to loan money ostensibly to purchase Greenleaf Property, which the Fund already owned.  Based on Flynn's representations, McDonough, Carroll, and Higgins wired money to Flynn's account at Eastern Bank held in the name of Opportunity Holdings, LLC for the purchase of the Greenleaf Property. Upon information and belief, Colman and/or Canavan drafted promissory notes for each investor.

67.     The payments Flynn and Colman received from Caraboolad, Derenzo, McDonough, Caroll, Higgins, and other investors in the Greenleaf Property were not used to purchase the property, as the Fund already owned it, nor were they used to develop the property. Rather, Colman, Flynn, and Canavan used the money to repay earlier investors and fraud victims from their other schemes.

68.     McDonough questioned Flynn concerning his investment in the Greenleaf Property and Flynn provided McDonough with falsified purchase and sale agreements that purportedly related to the sale of two of the units of the Greenleaf Street Property.  The buyer identified on the purchase and sale agreements, however, never intended to purchase any of the units at the Greenleaf Property.  Upon information and belief, Colman drafted the falsified purchase and sale agreements.

69.     Upon learning that the Greenleaf Property was already owned by Flynn, some of the investors confronted Flynn about the true ownership of the property, and Flynn admitted that

2255202_1

he owned it.  Certain of those investors filed suit against Flynn in Norfolk County Superior Court.

**East Howard Street Property Scheme**

70.    On October 16, 2002, LINC Property I, LLC ("LINC"), a Delaware corporation registered to do business in Massachusetts, entered into a listing agreement (the "Agency Agreement") with Flynn, on behalf of DJFCO, engaging Flynn as LINC's exclusive agent to sell property situated on East Howard Street in Quincy, Massachusetts (the "East Howard Street Property").

71.    At this time, Colman was general counsel to DJFCO and Flynn, and prepared the legal and transaction documents.

72.    Pursuant to the Agency Agreement, Flynn and DJFCO agreed to advertise and make all reasonable efforts to sell the East Howard Street Property for $1,750,000.

73.    Acting in concert, Colman, Flynn, and Canavan embarked on a scheme to take control of the East Howard Street Property.

74.    On February 5, 2003, LINC entered into a purchase and sale agreement for the sale of the East Howard Street Property to the Des Moines Street Realty Trust, of which Canavan was the trustee and in which Flynn had an interest.  The agreed purchase price of the property was $825,000.

75.    Flynn communicated to LINC only that the Des Moines Street Realty Trust was the nominee of a real estate developer named The Ansaldi Group, with whom Flynn had been negotiating for the sale of the property.  Flynn failed to inform LINC of his own interest in the Des Moines Street Realty Trust.

13

76.     On April 1, 2003, the transaction closed and LINC was paid $825,000, less Flynn's brokerage commission of $41,250.

77.     In an attempt to squeeze even more money from the East Howard Street Property, Flynn also negotiated a sale of the property to George Brewster ("Brewster").

78.     In or around February 2003, before the transaction between the Des Moines Street Realty Trust and LINC closed, Flynn induced Brewster to invest in the East Howard Street Property. Flynn told Brewster the sale price of the property was $1,325,000 million. Brewster wired $1,325,000 to Canavan, in whose name the property was purchased. Upon information and belief, Brewster did not know that Canavan was trustee to the Des Moines Street Realty Trust, which was then negotiating to purchase the property from LINC.

79.     LINC was also unaware of Flynn's negotiations with Brewster, in violation of the Agency Agreement.

80.     As a result, Brewster paid Canavan, Flynn, and DJFCO $1,325,000 for the East Howard Street Property, which Canavan as trustee purchased for only $825,000.

81.     Canavan later admitted to Brewster that the actual price of the East Howard Street Property was $825,000, and that Canavan had given the extra $500,000 to Flynn.

82.     Upon information and belief, Colman participated in the scheme to breach DJFCO's fiduciary and contractual duties under the Agency Agreement to LINC and defraud Brewster.

83.     Brewster later filed suit against DJFCO, Flynn, Canavan, and Colman for these and other fraudulent acts.

84.     On March 14, 2003, Frank Bellofatto, as trustee of the Bellofatto Family Realty Trust, sold 178-186 East Howard Street in Quincy to Canavan, as trustee of Pursuit Realty Trust.

85.     On April 7, 2004, Paul Talkowski, who, at the time, was President of DJFCO, replaced Canavan as trustee of Pursuit Realty Trust.  Colman notarized the Resignation of Trustee and Notice of Appointment of Successor Trustee.

86.     On June 9, 2005, Paul Talkowski as trustee of Pursuit Realty Trust, sold 178-186 East Howard Street in Quincy to James Ferrera Realty, Inc. for $605,000.00.  Colman notarized the Quitclaim Deed.

**Patriot Investments Scheme**

87.     In or about April 1999, Flynn approached Brewster in connection with an investment opportunity through a vehicle named "Patriot Acquisition."

88.     Flynn told Brewster that Patriot Acquisition was going to acquire investment properties in Billerica, Massachusetts.  Flynn asked Brewster to invest $1 million in the project. He told Brewster that he was the manager of Patriot Acquisition and provided Brewster with a brochure identifying the purpose of the business and specifying that he and Brewster were parties to the business.

89.     Like the other schemes, Brewster's involvement was limited to financing and Flynn promised to find and develop the properties.

90.     Brewster gave Flynn two checks, each for $500,000.  Flynn deposited the first check on April 21, 1999, endorsing it as: "For Deposit Only, Patriot Acquisitions, Daniel J. Flynn, III."  Flynn deposited the second check on May 21, 1999, endorsing it as: "Daniel J. Flynn, Patriot Acquisitions."

91.     Brewster also gave Flynn a check for $450,000 to purchase a mortgage on a piece of property in Rhode Island as part of the Patriot Acquisition project.  On June 1, 2000, Flynn gave Brewster a promissory note in the amount of $450,000, with the maker of the note listed as

Patriot Investments, LLC, Daniel J. Flynn, III, Manager and Daniel J. Flynn, III, Individually.  In total, Brewster invested $1,600,000 in the Patriot Acquisition project.

92.     The entity Patriot Acquisitions never existed.

93.     Patriot Investments, LLC was formed on October 14, 1999.  Stephen Colman was the manager of Patriot Investments, LLC.

94.     Upon information and belief, Flynn gave Brewster's investment to Patriot Investments, LLC, which was controlled by Colman.

**Solar Resources Scheme**

95.     At the same time as the schemes described above, Colman and the Enterprise engaged in a separate but related scheme to take control of Bill Colman's company, Solar Resources, by secretly and without authorization, transferring stock in the company to themselves, and Stephen Colman's siblings and Bill Colman's former wife immediately prior to or after Bill Colman's death so that over half of the company did not pass through Bill Colman's estate to his heirs (the "Solar Resources Scheme").

96.     In or around 1984, and prior to incorporating Solar Resources, Bill Colman acquired ownership of Water Right 13-3457 in Utah (the "Water Right").  The Water Right was a valuable property interest which he held in his personal capacity.

97.     In or around October 2003, Bill Colman formed Solar Resources, a Utah company, to develop land in Utah for salt extraction.  He was the sole owner and shareholder of Solar Resources at that time.  He spent several years securing key land leases, applying for water rights, acquiring various items of equipment for use in Solar Resources' planned operations, and making improvements to the leased property.

98.     In 2005, Stephen Colman became Treasurer and Secretary of Solar Resources.

16

99.     Approximately two weeks before Bill Colman died in December 2011, the Water Right was transferred from Bill Colman personally to Solar Resources.

100.    Upon information and belief, Stephen Colman orchestrated the transfer of the Water Right from Bill Colman to Solar Resources without Bill Colman's authorization.

101.    On December 14, 2011, three days after Bill Colman died, Stephen Colman attempted to file an Assignment of Water Right, purportedly signed by Bill Colman on November 26, 2011, with the Utah Division of Water Rights.  Colman's filing was rejected because he failed to include all of the required paperwork.

102.    Upon information and belief, Stephen Colman forged Bill Colman's signature on the Assignment of Water Right.

103.    On January 4, 2012, Stephen Colman submitted the missing paperwork to the Utah Division of Water Rights, completing the transfer of the Water Right from Bill Colman to Solar Resources, the company which he now controlled, almost a month after Bill Colman died.

104.    Because the Water Right was owned by Solar Resources and not Bill Colman personally at the time the estate was probated, this valuable asset was not part of Bill Colman's estate and was not distributed among his heirs.

**Fraudulent Stock Transfers**

105.    As personal representative of Bill Colman's estate, Stephen Colman assumed control over all of Bill Colman's assets.

106.    As personal representative of Bill Colman's estate, Colman also became president of Solar Resources.

107.    Upon information and belief, shortly after Bill Colman died, Stephen Colman orchestrated transfers of 53.5% of the shares of Solar Resources to himself, the two Enterprise

17

Defendants – Daniel J. Flynn and James Canavan – and his siblings, and Bill Colman's ex-wife Phyllis Colman.

108.    Colman caused 7,500 shares of Solar Resources stock to be transferred to himself.

109.    Colman caused 2,500 shares of Solar Resources to be transferred to Flynn.

110.    Colman caused 1,750 shares of Solar Resources stock to be transferred to Canavan.

111.    Colman caused 2,500 shares of Solar Resources stock to be transferred to each of his siblings: Lisa LaBique, Elizabeth Colman, Kirsten Hunt, Karen Reidy and Chris Colman.

112.    Stephen also caused 2,500 shares of Solar Resources stock to be transferred to Phyllis Colman.

113.    Upon information and belief, Colman did not pay for, or did not pay a fair price for, the 7,500 shares of Solar Resources.

114.    Upon information and belief, Lisa LaBrique did not pay for, or did not pay a fair price for, the 2,500 shares of Solar Resources she received from Colman.

115.    Upon information and belief, Elizabeth Colman did not pay for, or did not pay a fair price for, the 2,500 shares of Solar Resources she received from Colman.

116.    Upon information and belief, Kirsten Hunt did not pay for, or did not pay a fair price for, the 2,500 shares of Solar Resources she received from Colman.

117.    Upon information and belief, Karen Reidy did not pay for, or did not pay a fair price for, the 2,500 shares of Solar Resources she received from Colman.

118.    Upon information and belief, Chris Colman did not pay for, or did not pay a fair price for, the 2,500 shares of Solar Resources he received from Colman.

18

119.   Upon information and belief, Phyllis Colman did not pay for, or did not pay a fair price for, the 2,500 shares of Solar Resources she received from Colman.

120.   Upon information and belief, Flynn did not pay for, or did not pay a fair price for, the 2,500 shares of Solar Resources he received from Colman.

121.   Upon information and belief, Canavan did not pay for, or did not pay a fair price for, the 1,750 shares of Solar Resources he received from Colman.

122.   Upon information and belief, Colman, Flynn, and Canavan knew or had reason to know that the stock they received in Solar Resources was not authorized by Bill Colman and was procured by fraud.

123.   Around the same time, Stephen Colman convened a meeting of Colman Lerner's siblings, Robert Colman and Roberta Colman, and their cousin, Tom Collins, but did not invite Colman Lerner to, nor inform her of, the meeting.  None of Colman's siblings were present at the meeting.

124.   At the meeting, Stephen Colman discussed the division of Bill Colman's estate, and told Robert Colman, Roberta Colman and Tom Collins that Stephen Colman's siblings had allegedly "invested" in Solar Resources, which was why they would be receiving a share of the profits from the planned sale of Solar Resources.

125.   Colman intentionally concealed the fact of the meeting and the concocted story that Colman's siblings had purportedly "invested" in Solar Resources from Colman Lerner who would have known that was false.  Had Colman Lerner heard that Stephen Colman's siblings had "invested" in Solar Resources, she would have known that was not true and made inquiry.

126.    Upon information and belief, Stephen Colman drew up falsified documentation of the stock transfers, including falsified check(s) for $5,000 from all or certain of his sibling(s) purporting to purchase 2,500 shares of Solar Resources stock.

127.    Upon information and belief, Stephen Colman back-dated the stock certificates and checks to February 2011, prior to Bill Colman's death.

128.    The fraudulent and unauthorized stock transfers allowed Stephen Colman to remove over half of the stock in Solar Resources from Bill Colman's estate shortly after Bill Colman died.

129.    When Colman Lerner questioned Stephen Colman about how Stephen Colman's siblings came to be stockholders in Solar Resources, Stephen Colman told Colman Lerner that Bill Colman had "gifted" the shares to his siblings.  Colman made this misrepresentation to Colman Lerner to conceal the fraudulent scheme.

**Sale of Solar Resources and Distributions to Colman, Flynn, Canavan and Others**

130.    In or about 2012, Stephen Colman orchestrated the sale of Solar Resources to Great Salt Lake Minerals Corporation ("GSLMC").  The sale closed in December, 2012.  Colman structured the sale of Solar Resources as a stock sale, rather than an asset sale.

131.    Because Stephen Colman was the personal representative of the estate, and also a purported shareholder of Solar Resources individually, he had to disclose his interest in the company to each of the heirs and obtain their consent to the sale.

132.    Solar Resources sold for $11 million.

133.    Bill Colman's estate received approximately $5,115,000 from the sale of Solar Resources, which represented proceeds from the sale of 46.5% of stock in Solar Resources.

2255202_1

134.    The proceeds of the remaining 53.5% of stock in Solar Resources were distributed to Stephen Colman, his siblings, Phyllis Colman, Flynn, and Canavan.

135.    Colman received $2.5 million from the sale for his 7,500 shares of Solar Resources stock.

136.    Enterprise Defendant Flynn received $500,000 from the sale for his 2,500 shares of Solar Resources stock.

137.    Enterprise Defendant Canavan received $250,000 from the sale for his 1,750 shares of Solar Resources stock.

138.    Defendant Lisa LaBrique received $500,000 from the sale for her 2,500 shares of Solar Resources stock.

139.    Defendant Elizabeth Colman received $500,000 from the sale for her 2,500 shares of Solar Resources stock.

140.    Defendant Kirsten Hunt received $500,000 from the sale for her 2,500 shares of Solar Resources stock.

141.    Defendant Karen Reidy received $500,000 from the sale for her 2,500 shares of Solar Resources stock.

142.    Defendant Chris Colman received $500,000 from the sale for his 2,500 shares of Solar Resources stock.

143.    Phyllis Colman received $500,000 from the sale for her 2,500 shares of Solar Resources stock.

144.    Upon information and belief, Colman, Flynn and Canavan knew or had reason to know that the amounts they received for the sale of Solar Resources were not rightfully theirs as the stock was procured by fraud.

2255202_1

145.    Moreover, the amounts of monies received for the purported sale of shares are not comesurate with the number of shares.  For example, Colman received $2.5 million for the purported sale of 7,500 shares of Solar Resources stock, yet Flynn and Colman's siblings each received $500,000 for the purported sale of 2,500 shares of Solar Resources stock.  Accordingly, Colman received an additional $1 million over the same price per share received by Flynn and Colman's siblings.

146.    When Colman Lerner ultimately learned of the sale of Solar Resources, she still did not know that Stephen Colman, his siblings, Phyllis Colman, Flynn, and Canavan together owned over half of the company and received a substantial payout from the sale.

147.    Colman Lerner first learned of the stock transactions in the summer of 2018 when her cousin, Tom Collins, who was also an heir of the estate, told Colman Lerner that he had been present at a meeting with Stephen Colman and Colman Lerner's siblings, Robert Colman and Roberta Colman, shortly after Bill Colman's death.  At the meeting, Stephen Colman said that his siblings had each "invested" in Solar Resources.  At that time, Colman Lerner realized that Stephen Colman's prior explanation, that his siblings had been "gifted" the stock, was false, and that Stephen Colman had orchestrated the sham stock transactions.

148.    Colman Lerner has been injured by the fraudulent stock transfers and sale of Solar Resources because had the fraudulent stock transfers not taken place, all of the shares of Solar Resources would have passed through the estate and Colman Lerner would have received a share of the proceeds of the sale of those shares.

149.    Colman Lerner was also injured by Colman's transfer of the Water Right because if the Water Right had not been transferred to Solar Resources, it would have passed through the estate and Colman Lerner would have received a share of its value.

2255202_1

150.    Instead, Colman and the Enterprise transferred Bill Colman's valuable Water Right to Solar Resources, then transferred the stock of over half of the company to themselves, Stephen Colman's siblings and Phyllis Colman, and, as a result, stole a substantial share of Colman Lerner's inheritance.

151.    Stephen Colman remains personal representative of the estate.

152.    Stephen Colman is also personal representative of the estate of Colman Lerner's sister, Roberta Colman, who passed away on June 21, 2018.

**COUNT I**
**Violation of 18 U.S.C. § 1962 (c) Racketeer Influenced and Corrupt Organizations Act**

153.    Plaintiff realleges and incorporates herein the allegations of the preceding paragraphs 1-152.

154.    Defendant Stephen Colman is a culpable person for purposes of 18 U.S.C. § 1961(3).

155.    At all relevant times, the Enterprise, consisting of Colman, Flynn, and Canavan, was an association-in-fact enterprise within the meaning if 18 U.S.C. § 1961(4).

156.    As described herein, the Enterprise existed for the purposes of inducing investors to loan money to the enterprise under false pretenses and knowing the investors would not receive a return on their investments in order to obtain money not rightfully belonging to the enterprise and to illegally take control over Solar Resources, illegally increase the value of Solar Resources, and then sell it at a profit.

157.    The Enterprise formed in or around 1999 and continued at least until Flynn was indicted on September 23, 2015.

158.    18 U.S.C. § 1962(c) prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

23

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

159.   As described herein, committed a pattern of racketeering activity, consisting of repeated and continuous violations of 18 U.S.C. §§ 1341 and 1343, 18 U.S.C. § 2314, and 18 U.S.C. §§ 471-473.

160.   The pattern of racketeering activity includes, but is not limited to, the following conduct:

    a.  Colman, as Treasurer and Secretary of Solar Resources, caused 2,500 shares of stock in Solar Resources to be transferred to Flynn on or about January 7, 2008, or sometime thereafter, without Bill Colman's authorization, knowing such stock was taken by fraud in violation of 18 U.S.C. § 2314 (the National Stolen Property Act) and 18 U.S.C. §§ 471-473 (counterfeiting securities).

    b.  Colman caused Solar Resources to issue a promissory note to Canavan for $50,000 on September 14, 2010, or sometime thereafter, without Bill Colman's authorization.

    c.  On or about February 11, 2011, or sometime thereafter, Colman caused 7,500 shares of stock in Solar Resources to be transferred to himself without Bill Colman's authorization, knowing such stock was taken by fraud in violation of 18 U.S.C. § 2314 (the National Stolen Property Act) and 18 U.S.C. §§ 471-473 (counterfeiting securities).

    d.  On or about February 11, 2011, or sometime thereafter, Colman caused 2,500 shares of stock in Solar Resources to be transferred to each of his siblings and Bill

Colman's ex-wife Phyllis Colman, without Bill Colman's authorization, knowing such stock was taken by fraud in violation of 18 U.S.C. § 2314 (the National Stolen Property Act) and 18 U.S.C. §§ 471-473 (counterfeiting securities).

e.  In December 2011, Colman falsified a Water Right Assignment form that purported to transfer Water Right 13-3457 from Bill Colman to Solar Resources, and dated the form November 26, 2011.

f.  On December 14, 2011, three days after Bill Colman died, Stephen Colman sent or caused to be sent, by mail the falsified Water Right Assignment to the Utah Division of Water Rights in violation of 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud).

g.  On January 4, 2012, Colman drafted a Report of Water Right Conveyance and sent or caused it to be sent, by mail, to the Utah Division of Water Rights in violation of 18 U.S.C. §§ 1341 and 1343.

h.  In August 2012, Colman procured Colman Lerner's consent to the sale of Solar Resources without disclosing the facts that he had illegally transferred Water Right 13-3457 from Bill Colman's personal assets to Solar Resources, and illegally transferred almost half of the stock in Solar Resources to himself, Flynn, Canavan, his siblings, and Phyllis Colman.  Colman used the U.S. mail and wires to send the consent form to Colman Lerner in or about August, 2012, in violation of 18 U.S.C. §§ 1341 and 1343.

i.  In August 2012, Colman orchestrated the sale of Solar Resources' stock to Great Salt Lake Mineral Corporation and he, Flynn, Canavan, Colman's siblings, and Phyllis Colman received substantial payouts from the sale.

2255202_1

161.   Each violation enumerated above proximately damaged Colman Lerner.

## COUNT II
### Violation of 18 U.S.C. §§ 1962(a) and (b) Racketeer Influenced and Corrupt Organizations Act

162.   Plaintiff realleges and incorporates herein the allegations of the preceding paragraphs 1-161.

163.   Stephen Colman is a culpable person for purposes of 18 U.S.C. § 1961(3).

164.   At all relevant times, the Enterprise, consisting of Colman, Flynn, and Canavan, was an association-in-fact enterprise within the meaning if 18 U.S.C. 1961(4).

165.   As described herein, the Enterprise existed for the purposes of inducing investors to loan money to the enterprise under false pretenses and knowing the investors would not receive a return on their investments in order to obtain money not rightfully belonging to the Enterprise and to illegally take control over Solar Resources, illegally increase the value of Solar Resources, and then sell it at a profit.

166.   The Enterprise was formed in or around 1999 and continued at least until Flynn was indicted on September 23, 2015.

167.   18 U.S.C. § 1962(a) prohibits "any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . in which such person has participated as a principal . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishing or operation of, any enterprise [engaged in interstate or foreign] commerce."

168.   As described herein, Stephen Colman derived income through participating in a pattern of racketeering activity, and used or invested that income in the operation of various enterprises – namely DJFCO and the various real estate entities established by the Enterprise.

26

169.   The pattern of racketeering activity through which Stephen Colman derived income includes, but is not limited to, the following:

a.  Knowingly and purposefully using the United States mail and wire communications for the purpose of sending falsified promissory notes related to the DJF Real Estate Opportunity Fund 1, L.P. in violation of 18 U.S.C. §§ 1341 and 1343;

b.  Knowingly and purposefully using the United States mail and wire communications on April 16, 2007 to transmit the Private Placement Memorandum for the DJF Real Estate Opportunity Fund 1, L.P. which falsely stated that the Fund had over $21 million in investments and generated a rate of return of over 203 percent in order to obtain investments;

c.  Knowingly and purposefully using the United States mail and wire communications on January 14, 2008 to send individual subscription agreements to 25 individuals who had agreed to be limited partners in the Fund in Massachusetts, New York, New Jersey and California which falsely stated that the Fund had over "8.5 million [dollars] in committed capital."

d.  Knowingly and purposefully using the United States mail and wire communications in January 2012 for the purpose of inducing investors to invest in the Greenleaf Property under false pretenses including but not limited to telling investors, including Jay Derenzo, Walter McDonough, Kevin Carroll and Peter Higgins that their investments would be used to purchase the Greenleaf Street Property when the defendants already owned or controlled the Greenleaf Street Property; and

27

    e.  Knowingly and purposefully using the United States mail and wire communications on April 12, 2012 to send a periodic update to the limited partners in the Fund that listed seven difference investment properties and nine outstanding promissory notes, purportedly representing debts that were owed to the Fund and listed as having a combined value of over $2.3 million, all of which were fraudulent.

170.    18 U.S.C. § 1962(b) prohibits "any person through a pattern of racketeering activity, or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

171.    The defendants' racketeering activity includes, but is not limited to, the following actions:

    a.  Knowingly and purposefully using the United States mail and wire communications for the purpose of sending falsified promissory notes related to the DJF Real Estate Opportunity Fund 1, L.P. in violation of 18 U.S.C. §§ 1341 and 1343;

    b.  Knowingly and purposefully using the United States mail and wire communications for the purpose of inducing investors to invest in the Greenleaf Property under false pretenses including but not limited to telling investors that their investments would be used to purchase the Greenleaf Street Property when the defendants already owned or controlled the Greenleaf Street Property;

    c.  Using money and property fraudulently obtained to invest in other property and schemes of the criminal enterprise in violation of 18 U.S.C. § 1962(a);

d. Transferring Water-Right 13-3457 to Solar Resources without Bill Colman's authorization;

e. Transferring in interstate commerce stock in Solar Resources worth more than $5,000, knowing such stock was taken by fraud in violation of 18 U.S.C. § 2314 (the National Stolen Property Act);

f. Receiving stock in Solar Resources worth more than $5,000, knowing such stock was procured by fraud; 18 U.S.C. § 2315 (the National Stolen Property Act);

g. Obtaining stock in Solar Resources through a pattern of racketeering activity in violation of 18 U.S.C. c. 96, § 1962(b);

h. Knowingly and purposefully using the United States mail and wire communications for the purpose of fraudulently obtaining plaintiff Colman Lerner Colman-Colman Lerner's consent to the sale of Solar Resources in violation of 18 U.S.C. §§ 1341 and 1343; and

i. Participating in the affairs of Solar Resources through a pattern of racketeering activity in violation of 18 U.S.C. c. 96, § 1962(c).

172.    As set forth herein, each of the defendants participated in the conduct of the criminal Enterprise: Colman drafted fraudulent legal documents and caused them to be sent by email and mail to investors, Flynn induced investors to loan the enterprise money through fraud, misrepresentation, and deceit as to how the funds would be used and the strength of the investments, and Canavan contributed legal real estate work and purchased property that was central to the schemes to defraud.

173.     As set forth herein, the actions of the defendants have included the use of the mails and the internet in furtherance of their schemes to defraud, and constitute a pattern of actions which violate the provisions of 18 U.S.C. Chapter 96.

174.     As a result of the schemes to defraud, defendants received money and property by means of fraudulent pretenses.

175.     The defendants knowingly and willfully engaged in the schemes to defraud.

176.     As set forth above, the defendants have engaged in a pattern of racketeering activity including, but not limited to, mail and wire fraud, conversion, and the unlawful transfer and receipt of securities.

177.     The pattern of racketeering activity began no later than 1999.

178.     The predicate acts described herein are related and pose a threat of continued criminal activity as they have extended over a substantial period of time.

179.     Plaintiff has been damaged, and continues to be damaged, by the defendants' racketeering activities with respect to Solar Resources and the estate of William J. Colman.

180.     Unless abated, the defendants will likely continue their unlawful actions to transfer and conceal assets as evidenced by the activities set forth above.

**COUNT III**
**RICO Conspiracy 18 U.S.C. Section 1962(d)**

181.     Plaintiff realleges and incorporates herein the allegations of the preceding paragraphs 1-180.

182.     18 U.S.C. § 1962(d) provides that, "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."

30

183.    Stephen Colman knowingly joined in a conspiracy with Flynn and Canavan to participate in the conduct of the Enterprise and agreed to commit racketeering activity with Flynn and Canavan.

184.    Stephen Colman did in fact participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity by agreeing to commit, or in fact committing, the predicate offenses alleged herein.

185.    As a result, Colman Lerner has been damaged.

**COUNT IV**
**Breach of Fiduciary Duty**

186.    Plaintiff realleges and incorporates herein the allegations of the preceding paragraphs 1-185.

187.    By virtue of his position as Personal Representative of the Estate of William Colman, Stephen Colman owed Colman Lerner a fiduciary duty.

188.    By virtue of his actions, including, *inter alia*, self-dealing, secretly transferring stock from Solar Resources to himself, his siblings, Phyllis Colman, Daniel Flynn, and James Canavan, removing assets from the estate of Bill Colman, and concealing material information from Colman Lerner that he had a duty to disclose, Stephen Colman breached his fiduciary duty to Colman Lerner intentionally and in bad faith.

189.    Stephen Colman's breach of his fiduciary duty has caused Colman Lerner to suffer harm.

## COUNT V
### Fraud

190.    Colman Lerner realleges and incorporates herein the allegations of the preceding paragraphs 1-189.

191.    Stephen Colman, Flynn, and Canavan orchestrated secret, fraudulent stock transfers that gave shares in Solar Resources to themselves, Stephen Colman's siblings, and Phyllis Colman for either de minimus consideration or no consideration.

192.    Stephen Colman misrepresented to Colman Lerner that Bill Colman owned only 46.5% of Solar Resources, which would pass through the estate.

193.    Stephen Colman misrepresented to Colman Lerner that his siblings had been "gifted" shares in Solar Resources.

194.    Colman Lerner's consent to the sale of Solar Resources was obtained based on material misrepresentations and omissions concerning the ownership of Solar Resources.

195.    Stephen Colman intentionally concealed his actions from Colman Lerner.

196.    Colman Lerner relied on Stephen Colman's omissions to her detriment by failing to object to the distribution of the proceeds of the sale of Solar Resources during the probate of the estate of Bill Colman.

197.    Colman Lerner could not and did not discover the harm to her interest in the estate due to Stephen Colman's fraudulent concealment of the stock transfers and ownership in the company.

198.    As a result of Stephen Colman's misrepresentations and omissions, Colman Lerner suffered harm.

## COUNT VI
### Money Had and Received
(Against Defendants Lisa LaBrique, Elizabeth Colman, Karen Reidy, Kirsten Hunt, and Christopher Colman)

199.    Colman Lerner realleges and incorporates herein the allegations of the preceding paragraphs 1-198.

200.    As alleged herein, Stephen Colman orchestrated the fraudulent transfer of stock in Solar Resources to each of the Money Had and Received Defendants.

201.    Each of the Money Had and Received Defendants either failed to pay for, or paid insufficient consideration for, the Solar Resources stock they received.

202.    The Money Had and Received Defendants' shares of Solar Resources stock should have passed through Bill Colman's estate to his heirs-at-law.

203.    Each of the Money Had and Received Defendants received $500,000 upon sale of Solar Resources to Great Salt Lake Mineral Company.

204.    Accordingly, the Money Had and Received Defendants have in their possession monies that were owed to the estate and, in turn, to Colman Lerner as an heir at law of the estate.

205.    Colman Lerner has no adequate remedy at law as against the Money Had and Received Defendants.

206.    Equity and good conscience dictates that the money received by the Money Had and Received Defendants be applied to the estate of Bill Colman and redistributed to his heirs at law.

WHEREFORE, Plaintiff requests that the Court:

A.    Enter judgment in Plaintiff's favor and against Defendant in the amount of actual damages sustained by Plaintiff as a direct and proximate result of Defendant's unlawful conduct;

B.  Enter an injunction against Defendant from further RICO violations and

divestment of any interests he has in any related entities;

C.  Order the Defendant to account for the property that he has unlawfully

appropriated;

D.  Award Plaintiff treble damages and attorneys' fees, costs and expenses pursuant

to 18 U.S.C. 1964(c);

E.  Award Plaintiff other relief that the Court deems just and proper.

## JURY DEMAND

**PLAINTIFF SANDRA COLMAN LERNER HEREBY DEMANDS A
TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,
SANDRA COLMAN LERNER
By her attorneys,

Michael F. Connolly, BBO #551273
Evan Georgopoulos, BBO #628480
Rubin and Rudman LLP
53 State Street, 15th Floor
Boston, MA 02109
Tel: 617 330-7101
Fax: 617 330-7550
mconnolly@rubinrudman.com
egeorgopoulos@rubinrudman.com

Dated: August 12, 2019

34

2255202_1