UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
SANDRA COLMAN LERNER,           )
                                )
                  Plaintiff,    )
                                )
        v.                      )        CIVIL ACTION
                                )        NO. 19-11738-WGY
STEPHEN J. COLMAN,              )
DANIEL J. FLYNN III,            )
JAMES CANAVAN, LISA LABRIQUE,   )
ELIZABETH COLMAN, KAREN REIDY,  )
KIRSTEN HUNT, and WILLIAM       )
CHRISTOPHER COLMAN,             )
                                )
                  Defendants.   )
_____)

YOUNG, D.J.                              September 4, 2020

**MEMORANDUM AND ORDER**

## I.   INTRODUCTION

This estate dispute has morphed into a civil action under

the Racketeer Influenced and Corrupt Organizations Act ("RICO"),

18 U.S.C. § 1964.  Susan Colman Lerner ("Lerner") alleges that

her cousin Stephen Colman ("Colman"), while participating in a

criminal enterprise, used his position as personal

representative of their uncle's estate to enrich his associates

and siblings at the expense of the estate.  Lerner also brings

Massachusetts law claims for breach of fiduciary duty, fraud,

and, with respect to Colman's siblings, money had and received.

Colman and the other defendants seek to dismiss her claims,

arguing that she fails properly to allege a RICO violation, that her RICO claims are barred, and that her state law claims are unavailing.

Lerner alleges Colman and his associates were involved in five different schemes.  Four of these schemes may not be used to develop a RICO claim, in accordance with section 107 of the Private Securities Litigation Reform Act, because they are actionable as securities fraud.  The last scheme, the Solar Resources scheme from which Lerner alleges injury, is not alone sufficient to sustain her RICO claims.  The defendants' motions to dismiss must therefore be granted as to Lerner's RICO claims. Since the RICO claims are the sole federal questions involved and there is no diversity jurisdiction, the Court declines to exercise supplemental jurisdiction over the remaining claims and therefore dismisses them for want of jurisdiction.

## II.  BACKGROUND

### A.  Factual Allegations

In October 2003, William Colman ("Bill Colman") formed Solar Resources, Inc. ("Solar Resources"), a Utah company, to develop land there for salt extraction.  Compl. ¶ 97, ECF No. 3. At the time, he was Solar Resources' sole owner and stockholder. Id.  Bill Colman's nephew Stephen became treasurer and secretary of Solar Resources in 2005.  Id. ¶ 98.

On December 11, 2011, Bill Colman died intestate on

Martha's Vineyard, leaving behind no children and no spouse.
Id. ¶ 13.  His heirs-at-law were his twelve nieces and nephews.
Id. ¶¶ 14-18.  Upon his uncle's death, Colman volunteered to
serve as personal representative and took sole control of Bill
Colman's estate.  The estate included Solar Resources, as well
as Water Right 13-3457 in Utah (the "water right"), which Bill
Colman acquired in 1984 and held in his personal capacity.  Id.
¶¶ 27-28, 96.

Two weeks before his death, Bill Colman's personal water
right was transferred to Solar Resources.  Id. ¶ 99.  Stephen
Colman then filed an Assignment of Water Right with the Utah
Division of Water Rights on December 14, 2011, three days after
Bill Colman's death, which was rejected.  Id. ¶ 101.  On January
4, 2012, Colman resubmitted the Assignment, which was then
approved, completing the transfer of the water right to Solar
Resources.  Id. ¶¶ 100-103.  The complaint alleges that Colman
forged Bill Colman's signature to orchestrate this transfer
without his knowledge.  Id.  As a result, the water right was
not included in Bill Colman's estate when Stephen meted out its
assets in probate.  Id. ¶ 104.

Shortly after his uncle's death, Colman became president of
Solar Resources, and transferred a total of 53.5 percent of the
company's shares to himself and two of his associates -- Daniel
J. Flynn ("Flynn") and James Canavan ("Canavan") -- as well as

Bill Colman's ex-wife Phyllis and Colman's siblings (the "Siblings"): Lisa LaBrique, Elizabeth Colman, Karen Reidy, Kirsten Hunt, and William Christopher Colman.  Id. ¶¶ 105-129. Around the time of the transfers, Colman met with cousins Robert Colman, Roberta Colman, and Thomas Collins (but not Lerner), and informed them that he and his siblings had invested in Solar Resources.  Id. ¶¶ 123-125, 147.  Lerner learned of the stock transfers in 2018, when Collins told her about his meeting with Colman.  Id. ¶¶ 146-147.

In December 2012, Colman executed the stock sale of Solar Resources to Great Salt Lake Minerals Corporation ("GSLMC") for $11,000,000.  Id. ¶¶ 130, 132.  Bill Colman's estate received roughly $5,115,000 for its 46.5-percent stake in Solar Resources.  Id. ¶ 133.  Colman, his siblings, Phyllis Colman, Flynn, and Canavan split the proceeds from the remaining 53.5 percent of stock, albeit in unequal portions.  Id. ¶¶ 134-145.

### B.  RICO Allegations

Lerner claims the Solar Resource transfers were the work of a criminal enterprise composed of Colman, Flynn, and Canavan. Id. ¶¶ 35-50.  In her complaint, Lerner notes the various ties that bind the three men, who have known each other since high school and did business in the same building in Quincy, Massachusetts for several years.  Id. ¶¶ 35, 38-41.  From 1995 until 2014, Colman worked as general counsel for Flynn's

company, Daniel J. Flynn & Co. ("DJFCO").  Id. ¶ 38.  Lerner

claims the Solar Resources stock and water right transfers were

the latest in the group's "series of fraudulent schemes to

divert monies and assets from third parties in order to enrich

themselves and others working with them."  Id. ¶ 42.

To establish the existence of a criminal enterprise under

RICO, Lerner alleges four predicate acts in addition to the

Solar Resources scheme, two of which relate to a fraud

conviction for which Flynn is currently serving a federal

sentence.

First, Lerner alleges that Colman joined Flynn in

soliciting investments in Flynn's DJF Real Estate Opportunity

Fund ("DJF Fund") in 2008, and subsequently drafted false

promissory notes to misrepresent the fund's holdings in its

communications to other limited partners between 2010 and 2012.[1]

Id. ¶¶ 51-57.  Second, Lerner claims Colman, Canavan, and Flynn

engaged in a Ponzi scheme involving a building on Greenleaf

Street in Quincy (the "Greenleaf Property"), which Flynn

purchased in 2005.  Id. ¶¶ 58-69.  She alleges Flynn obtained

loans and other investments ostensibly related to the purchase

and development of the Greenleaf Property, which were instead

---

[1] Flynn and his general partner, Alex Petro, signed the
communications.  Compl. ¶ 53.  Petro died by suicide in December
2014.  Id. ¶ 57.

"used . . . to repay earlier investors and fraud victims from their other schemes." Id. ¶ 67.  Lerner claims Colman drafted loan documents, promissory notes, and false purchase and sale agreements for Flynn, while Canavan "conducted . . . residential real estate work and closings." Id. ¶ 58.

On February 1, 2017, Flynn pleaded guilty to nine counts of federal mail and wire fraud arising from a series of schemes that occurred between 2007 and 2015, including the DJF Fund and Greenleaf Property schemes.  Id. ¶ 44; see also Indictment ¶¶ 6-13, 17-23, United States v. Flynn, Crim. A. No. 15-10283 (D. Mass. 2017) (Zobel, J.), ECF No. 12 ("Flynn Indictment"); Electronic Clerk's Notes, id., ECF No. 39.  As part of his criminal sentence Flynn agreed to pay more than $20,000,000 in restitution to seventy-three victims.  Assented Motion Joint Restitution Order, Flynn, Crim. A. No. 15-10283, ECF No. 58.

Third, Lerner claims Colman, Canavan, and Flynn fraudulently took control of a property on East Howard Street in Quincy (the "East Howard Street Property").  Compl. ¶¶ 70-86. In 2002, Flynn, acting on behalf of DJFCO, entered into a listing agreement with LINC Property I, LLC ("LINC"), a Delaware company doing business in Massachusetts, to act as its agent in selling the East Howard Street Property.  Id. ¶ 70, 72.  The following year, LINC struck a purchase and sale agreement with the Des Moines Street Realty Trust for $825,000.  Id. ¶ 74.

[ 6 ]

Unbeknownst to LINC, Flynn had an interest in this trust, and
Canavan was a trustee.  Id. ¶¶ 74-75.  Around the same time,
Flynn negotiated the sale of the East Howard Street Property to
George Brewster ("Brewster") for $1,325,000 and pocketed the
$500,000 windfall.  Id. ¶¶ 77-78, 80-81.

Fourth and finally, Lerner claims Flynn obtained from
Brewster financing for investment properties in Massachusetts
and Rhode Island through a nonexistent entity.  Id. ¶¶ 87-94.
Brewster invested $1,600,000 in "Patriot Acquisition," which
Lerner claims Flynn then shuffled to an entity named Patriot
Investments, LLC, without providing any benefit to Brewster.
Id. ¶¶ 91, 93-94.[2]  Colman himself was the listed manager of
Patriot Investments, LLC.  Id. ¶¶ 93-94.

Lerner alleges three RICO violations (counts I-III).  Id.
¶¶ 153-185.  Under Massachusetts law, she alleges breach of
Colman's fiduciary duty as personal representative of Bill
Colman's estate (count IV), id. ¶¶ 186-189; fraud arising from
the Solar Resources stock transfers and sale (count V), id. ¶¶
190-198; and a claim for money had and received against the
Siblings (count VI).  Id. ¶¶ 199-206.  She seeks damages --
including treble damages and reasonable attorney's fees and

---

[2] Brewster brought an action for fraud against DJFCO, Flynn,
Colman and Canavan, after Canavan admitted the fraud to him.
Compl. ¶¶ 71, 84.

costs as provided under section 1964(c) -- as well as injunctive relief.

This Court has federal question jurisdiction over Lerner's claims because her cause of action arises under section 1964(c) of the RICO statute.  28 U.S.C. § 1331.

### C.  Procedural History

Lerner filed suit in this Court on August 12, 2019.  See Compl.  On September 13, 2019, Colman moved to dismiss Lerner's complaint for failure to state a claim.  Def. Colman's Mot. Dismiss, ECF No. 25; Def. Colman's Mem. Supp Mot. Dismiss ("Colman Mem."), ECF no. 26.  The Siblings moved to dismiss Lerner's claims on September 23, 2019, and joined Colman's motion.  Defs.' Mot. Dismiss, ECF No. 29.  Canavan likewise moved to dismiss on October 7, 2019.  Def. Canavan Mot. Dismiss, ECF No. 40; Def. Canavan Mem. Supp. Mot. Dismiss ("Canavan Mem."), ECF No. 41.

Lerner filed her opposition to Colman and the Siblings' motions on October 15, 2019, Pl.'s Opp'n Mot. Dismiss ("Pl.'s Opp'n Colman"), ECF 43, followed by her opposition to Canavan's motion on October 21.  Pl.'s Opp'n Canavan Mot. Dismiss ("Pl.'s Opp'n Canavan"), ECF No. 44.

This Court held a hearing on the motions on December 10, 2019.  Elec. Clerk's Notes, ECF No. 45; Tr. Mot. Dismiss Hr'g ("Hr'g Tr."), ECF No. 47.  At the hearing, Lerner agreed to

consider amending the complaint by re-pleading the RICO claims
in the alternative as securities fraud claims, id., but
ultimately decided that there was no basis for doing so.  Letter
Michael Connolly, ECF No. 48.

## II.  ANALYSIS

### A.  Legal Standard and Preliminary Issues

#### 1.    Standard of Review

In order to survive a motion to dismiss, a complaint must
"state a claim upon which relief can be granted."  Fed. R. Civ.
P. 12(b)(6).  A complaint must contain sufficient factual
allegations that, accepted as true, "state a claim to relief
that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550
U.S. 544, 570 (2007).  This Court will "draw every reasonable
inference" in favor of the plaintiff, Berezin v. Regency Sav.
Bank, 234 F.3d 68, 70 (1st Cir. 2000), but it will disregard
statements that "merely offer legal conclusion[s] couched as . .
. fact[ ] or [t]hreadbare recitals of the elements of a cause of
action," Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st
Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)
(alterations and omission in original) (internal quotation marks
omitted)).  "A 'formulaic recitation of the elements of a cause
of action' is not enough."  Whitman & Co., Inc. v. Longview
Partners (Guernsey) Ltd., 140 F. Supp. 3d 138, 140 (D. Mass.
2015) (quoting Twombly, 550 U.S. at 555).

[ 9 ]

### 2.   Heightened Pleading Standard for Fraud

Federal Rule of Civil Procedure 9(b) creates a heightened pleading standard for allegations of fraud, under which "a party must state with particularity the circumstances constituting fraud or mistake," though the elements of "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Where, as here, "the predicate acts supporting a RICO claim sound in fraud, the plaintiff must assert all elements of his RICO claim according to the heightened pleading requirements of Fed. R. Civ. P. 9(b)." System Mgmt., Inc. v. Loiselle, 91 F. Supp. 2d 401, 408 (D. Mass. 2000) (citing Feinstein v. Resolution Trust Corp., 942 F.2d 34, 42 (1st Cir. 1991)).  Colman argues that Lerner has failed to plead any of the predicate acts involving fraud with the requisite specificity under Rule 9(b).  Colman Mem. 12-14.

The goal of Rule 9(b) is "to give adequate notice of the plaintiff's claim of fraud."  McGinty v. Beranger Volkswagen, Inc., 633 F.2d 226, 228-29 (1st Cir. 1980).  This heightened pleading standard for mail and wire fraud typically requires a plaintiff to provide the "time, place and content" of the allegedly fraudulent communications.   Ahmed v. Rosenblatt, 118 F.3d 886, 889 (1st Cir. 1997) (dismissing RICO claim for failure to plead with particularity).  Where mail fraud is alleged as the predicate act, plaintiffs must allege "(1) a scheme to

defraud based on false pretenses; (2) the defendant's knowing
and willing participation in the scheme with the intent to
defraud; and (3) the use of interstate mail or wire
communications in furtherance of that scheme." United States v.
Cheal, 389 F.3d 35, 41 (1st Cir. 2004).  Notably, reliance is
not an element of federal wire fraud, nor of a RICO claim based
on wire fraud.  Bridge v. Phoenix Bond & Indem. Co., 553 U.S.
639, 649 (2008).

        This Court disagrees with Colman that the claims must be
dismissed under Rule 9(b) because Lerner's complaint
sufficiently alleges the time, place, and content of each of the
alleged schemes to survive scrutiny under Rule 9(b).  First,
Lerner sufficiently alleges the fraudulent conduct at issue in
the Solar Resources scheme: the allegedly fraudulent transfer of
the water right from Colman's estate to Solar Resources; the
allegedly fraudulent transfer of stock from Solar Resources to
Colman, Flynn, Canavan, and Colman's family; and the allegedly
fraudulent communication from Flynn to Colman inducing her
consent to the sale of Solar Resources.  Compl. ¶ 160.  Lerner
lists the date, parties, and content of each of these
communications or actions.  Id.  For example, with respect to
Colman's communications with the Utah Division of Water Rights,
Lerner alleges that Colman sent messages on December 14, 2011
and January 4, 2012, and names the type of documents Colman

sent.  Id. ¶¶ 160(g), 160(t).  Lerner's "conclusory" allegation
that these communications were fraudulent is sufficient, Colman
Mem. 13, as a party at the pleading stage need not provide
actual evidence of intent or knowledge.  McGinty, 633 F.2d at
228.  Lerner also sufficiently pleads the elements of wire and
mail fraud because she alleges material false pretenses,
Colman's knowledge and intent, and the use of interstate
communications for the three interlocking, allegedly fraudulent
acts (the water rights transfer, the stock transfers, and the
inducement of her consent).  Compl. ¶ 160; see Bonilla v. Volvo
Car Corp., 150 F.3d 62, 66-67 (1st Cir. 1998).

     Lerner makes similarly detailed allegations for each of the
four alleged Flynn-led schemes.  For example, for the DJF
Opportunity Fund Scheme, Lerner states that Colman drafted
fraudulent subscription agreements in January 2008 for twenty-
five individuals, and caused them to be sent by email or mail to
partners in Massachusetts, New York, California and elsewhere.
Compl. ¶¶ 51-52.  With respect to intent she pleads that Colman
and/or Canavan forged signatures on promissory notes in support
of the fraudulent scheme.  Id. ¶¶ 54-56.  The allegations are
similarly detailed for the other three predicate schemes.  Id.
¶¶ 58-94.  In fact, Lerner is able to pinpoint the exact dates
that many of the allegedly fraudulent communications were sent
to investors.  Id. ¶ 169.

In conclusion, Lerner's pleadings are sufficiently detailed to survive Colman's Rule 9(b) challenge.

### 3.   Time Bar

Colman argues that Lerner's RICO claims are time barred because the RICO statute of limitation is four years, the alleged fraudulent concealment of his stock transfer occurred in 2012, and Lerner does not plead with sufficient particularity that the existence of the fraud was concealed from her.  Colman Mem. 19 (citing Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143 (1987)).  Under the injury discovery accrual rule, the clock begins to tick on a RICO claim when the plaintiff knows or should know of her injury, or in other words, when she receives "storm warnings" of potential fraud.  Álvarez-Maurás v. Banco Popular of P.R., 919 F.3d 617, 626 (1st Cir. 2019) (quoting Young v. Lepone, 305 F.3d 1, 8 (1st Cir. 2002)).  Once a reasonable person receives sufficient notice of potential injury as to give rise to suspicion, the statute of limitation will begin to run unless she diligently investigates, and she is charged with knowledge of those facts that would have been available after such investigation.  McIntyre v. United States, 367 F.3d 38, 52 (1st Cir. 2004).  The test of whether a plaintiff "should have" suspected fraud is objective.  Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 128 (1st Cir. 1987).

Lerner alleges in her complaint that she first learned of

[13]

the 2012 meeting between Colman and the other family members, at
which he told them the shares of Solar Resources were
investments rather than gifts, in 2018, which raised her
suspicion of fraud.  Compl. ¶ 117.  Arguably, Lerner could have
become suspicious when she learned that some members of the
family had received stock transfers as "gifts," id., and indeed
it appears from her complaint that she did ask Colman for an
explanation before ultimately signing her consent to the
transfers.  Id. ¶ 129; Colman Mem., Ex. 1, Consent to Petition
and Order, ECF No. 26-1.  There is significantly less notice of
potential fraud here than was present in other cases where
courts have found such notice to exist, however.  See, e.g.,
Painters & Allied Trades Dist. Council 82 Health Care Fund v.
Forest Pharms., Inc., 915 F.3d 1, 14-15 (1st Cir. 2019)
(existence of other lawsuits after unsealing of government
complaint against company triggered inquiry notice); Morales-
Melecio v. United States (HHS), 890 F.3d 361, 369 (1st Cir.
2018) (death certificate indicating septic shock triggered
inquiry notice of medical malpractice).  The situation here
appears more like Stanley v. Schimdt, where another session of
this Court determined that neither the fact that a broker was
investing in overly risky securities, nor that he disclosed
conflicts of interest, triggered inquiry notice for potential
securities fraud.  369 F. Supp. 3d, 297, 309-310 (D. Mass. 2019)

[14]

(Gorton, J.).  Still, "[t]his inquiry is highly fact- and case-specific."  McIntyre, 367 F.3d at 52.  Taking all inferences in favor of the non-moving party, Lerner has pled sufficient facts to allow the inference that she could not have reasonably learned of Colman's deceit until 2018, and therefore that her claims are not time barred.

### B.   Counts I-III: Civil RICO

Lerner brings a private cause of action under RICO, 18 U.S.C. § 1964(c), and alleges violations of sections 1962(c) (count I), 1962(a)-(b) (count II), and 1962(d) (count III).

Lerner's first claim is for violation of section 1962(c).  Compl. ¶¶ 153-161.  In order to state a section 1962(c) RICO claim, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985) (footnote omitted).  A plaintiff may pursue a civil action under RICO only if she "can demonstrate (1) a violation of section 1962, and (2) harm 'by reason of' the violation.  The harm alleged may be either 'direct' or 'indirect,' so long as it 'flows from' the predicate acts."  Willis v. Lipton, 947 F.2d 998, 1000 (1st Cir. 1991) (internal citations omitted).  It is sufficient for purposes of standing to show injury from only one of the predicate acts.  Pelletier v. Zweifel, 921 F.2d 1465, 1497 (11th Cir. 1991).

Though Lerner explicitly lists only the activity related to
Solar Resources under this claim, Compl. ¶ 169, the claim
incorporates her allegations regarding the other Flynn-led
schemes, and she considers them all part of a single enterprise.
Id. ¶¶ 162, 165.  Lerner alleges that between 2008 and 2011,
Colman caused transfers of Solar Resources stock to Flynn, the
Siblings, Phyllis Colman, and himself without Bill Colman's
authorization, "knowing such stock was taken by fraud" in
violation of the National Stolen Property Act, 18 U.S.C. § 2314,
and 18 U.S.C. §§ 471-473.  Compl. ¶¶ 159, 160a.  Additionally,
Lerner claims Colman committed mail and wire fraud, 18 U.S.C. §§
1341, 1343, by procuring her consent to the sale of Solar
Resources in August 2012 through interstate wire without
disclosing (1) the transfer of the water right from Bill Colman
to Solar Resources and (2) the transfer of more than half of
Solar Resources' stock to Colman, Flynn, the Siblings, and
Phyllis Colman.  Compl. ¶ 160h.  Lerner claims that Colman,
Canavan, and Flynn comprise an association-in-fact enterprise,
which was active from 1999 until Flynn's indictment in 2015, and
that this enterprise committed a pattern of racketeering
activity consisting of the Solar Resources scheme and the four
Flynn-led investment schemes.  Compl. ¶¶ 155-160.  The viability
of this claim depends on the applicability of section 107 of the

Private Securities Litigation Reform Act, which will be discussed _infra_.

Lerner's second claim, for violation of sections 1962(a) and (b), is easily disposed of due to inadequate pleading. Section 1962(a) makes it unlawful for any person to use income derived from a pattern of racketeering activity to acquire an interest in a business or operation involved in interstate commerce. 18 U.S.C. § 1962(a). An allegation that the defendant harmed the plaintiff solely and directly through a predicate act (as opposed to through the use of income derived from the racketeering) does not meet the requirement of this section. _See, e.g._, _Abraham_ v. _Singh_, 480 F.3d 351, 356-57 (5th Cir. 2007). Section 1962(b) makes it unlawful for a party to acquire an interest in a business directly through racketeering activity. 18 U.S.C. § 1962(b). As with section 1962(a), an allegation that the defendant harmed the plaintiff directly through the predicate act is insufficient; the injury must come as a result of the defendant using racketeering activity to gain an interest in a business. _See_ _Compagnie De Reassurance D'Ile De Fr._ v. _New Eng. Reinsurance Corp._, 57 F.3d 56, 92 (1st Cir. 1995); _P.R. Med. Emergency Group, Inc._ v. _Iglesia Episcopal Puertorriqueña, Inc._, 118 F. Supp. 3d 447, 459 (D.P.R. 2015).

In making this claim, Lerner describes the four Flynn-led schemes and the Solar Resources scheme, draws a connection

between them, and labels the entire course of conduct a "pattern
of racketeering activity." Compl. ¶ 168-178. Lerner alleges
that she has been damaged by this scheme due to her status as a
beneficiary of William Colman. Id. ¶ 179. The problem is that
in count II Lerner has thoroughly alleged a RICO enterprise in
accordance with section 1962(c), but not 1962(a) or (b); she
does not allege that the defendants used the income or influence
derived from their racketeering enterprise to enable the Solar
Resources scheme, but instead that they directly gained control
of it through fraud. Id. ¶¶ 168, 179.[3] Her allegation that
Flynn reinvested his ill-gotten gains back into his own real
estate holdings is insufficient because her injury was unrelated
to these investments. Id. ¶ 168; cf. Ouaknine v. MacFarlane,
897 F.2d 75, 83 (2d Cir. 1990).

The problem with Lerner's pleading echoes the pleading
considered in Abraham v. Singh, where the Fifth Circuit upheld a
district court's dismissal of charges under sections 1962(a) and
(b), but reversed for sections 1962(c) and 1962(d) (conspiracy
to commit a RICO violation). 480 F.3d at 356-57. That case
involved claims by a group of Indian citizens alleging human

---

[3] For an example of a proper 1962(a) allegation, see System
Mgmt., 91 F. Supp. 2d at 415-17 (ruling plaintiff had made a
valid 1962(a) claim by alleging the defendants had used income
derived from unlawful underpayment of wages to subsidize lower
contract bids, and therefore injure them by underbidding for
contracts).

[18]

trafficking: they came to the United States after being promised well-paying jobs and permanent residence, only to have their passports confiscated and wages stolen.  Id. at 353-54.  The Fifth Circuit explained that these charges did not match subsections 1962(a) or (b) because there was no connection between the workers' injuries and the defendant acquiring an interest in a company, but the scheme as a whole could certainly qualify as a racket, allowing claims under subsections 1962(c) and (d).  Id. at 356-57.  This pleading requirement reflects the purpose of these sections.  While the RICO laws on the whole may be used to target a wide variety of rackets, Sedima, 473 U.S. at 497, subsections (a) and (b) have the narrower original purpose of targeting organized crime that uses ill-gotten profits, threats, coercion, or debt to gain control of legitimate business.  Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1188, 1190 (3d Cir. 1993).

Finally, Lerner brings her third claim under section 1962(d), which prohibits conspiracy to commit a RICO violation. 18 U.S.C. § 1962(d).  To establish a conspiracy under section 1962(d), it is sufficient to prove that the defendant agreed with one or more individuals to commit at least two predicate offenses in violation of subsection 1962(a), (b) or (c).  Aetna Casualty Surety Co. v. P & B Autobody, 43 F.3d 1546, 1562 (1st Cir. 1994) (citing United States v. Boylan, 898 F.2d 230, 252

(1st Cir. 1990)).  This count is dependent on the existence of another viable RICO claim.  See Beck v. Prupis, 529 U.S. 494, 507 (2000)

        **1.   The Private Securities Litigation Reform Act Exception**

The first step in analyzing liability under subsections 1962(c) and (d) is to determine which alleged predicate acts support viable RICO causes of action.  Colman argues that Lerner's RICO claims must be dismissed because "the predicate acts alleged by her are grounded in securities fraud which is exempt from liability under RICO."  Colman Mem. 15.  This argument refers to section 107 of the 1995 Private Securities Litigation Reform Act (PSLRA), which modified section 1964(c) by barring a private plaintiff from relying on "conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962."  18 U.S.C. § 1964(c).

Colman argues that the four schemes allegedly led by Flynn cannot be used as predicate acts because they involve promissory notes and securities fraud.  Colman Mem. 15.  At oral argument, Colman clarified that this argument applied only to the four Flynn-led transactions, under the theory that Colman's alleged actions with respect to Solar Resources did not involve the "purchase and sale" of a security and therefore could not have

been part of the same RICO "scheme" as the Flynn-led

transactions.  Hr'g Tr. 7-9.  The Second Circuit has treated the

invocation of the PSLRA exception as an affirmative defense,[4] so

the Court will limit its analysis of the PSLRA exemption to the

four Flynn-led schemes.  See Gilmore v. Gilmore, 503 Fed. Appx.

97, 99 (2d Cir 2012).[5]

When it passed the Private Securities Litigation Reform Act

in 1995, "Congress meant not only to 'eliminate securities fraud

as a predicate offense in a civil RICO action, but also to

prevent a plaintiff from pleading other specified offenses, such

as mail or wire fraud, as predicate acts under civil RICO if

such offenses are based on conduct that would have been

actionable as securities fraud.'"  Calderon Serra v. Banco

Santander Puerto Rico, 747 F.3d 1, 4 (1st Cir. 2014) (quoting

Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc., 189 F.3d 321,

327 (3d Cir. 1999)); see Mathews v. Kidder, Peabody & Co., Inc.,

161 F.3d 156, 170 (3d Cir. 1998) (detailing the PSLRA's

legislative history).  Consequently, this Court must make "a

---

[4] As Colman has stated he is not waiving any affirmative
defenses, he would be able to argue at a future stage of these
proceedings that the PSLRA exception should apply to the alleged
actions in the Solar Resources scheme, should he determine such
an argument to have merit.  See Colman Mem. 2 n.1.  Furthermore,
the reasoning from Gilmore suggests that he could raise this
defense at a later stage of the proceedings even if he had not
explicitly reserved his rights.  503 Fed. Appx. at 97.
[5] Canavan has joined all of Colman's arguments on this point
without raising any new ones of his own.  See Canavan Mem. 6.

sort of reverse Rule 12(b)(6) inquiry," Calderon Serra, 747 F.3d at 4, to determine whether the conduct Lerner alleges would be "actionable as fraud in the purchase or sale of securities."  18 U.S.C. § 1964(c); see Bald Eagle, 189 F.3d at 330 ("[T]he proper focus of the analysis is on whether the conduct pled as predicate offenses is 'actionable' as securities fraud . . . .").

Although section 1964(c) does not specify which statute this Court should use as its benchmark for an actionable securities fraud claim, the First Circuit has relied upon section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and U.S. Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5.  See Calderon Serra, 747 F.3d at 4 (noting that "actions for fraud in the purchase or sale of securities often arise" under section 10(b) and Rule 10b-5). These provisions target fraud "in connection with the purchase or sale" of securities.  Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 733 (1975).  Therefore, this Court must determine "whether the RICO counts in the plaintiff's Complaint 'rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities'" under section 10(b) or Rule 10b-5.  Chase v. Merson, 384 F. Supp. 3d 106, 111 (D. Me. 2019) (footnote omitted) (quoting Bald Eagle, 189 F.3d at 327).

Actionable by whom?  Neither this Court nor the First Circuit has addressed whether the PSLRA exception applies where the RICO plaintiff herself could not bring an action for securities fraud.  See Pl.'s Opp'n Colman 22-23.  In other words, does a civil RICO suit run afoul of the PSLRA only when the securities fraud alleged is actionable by the RICO plaintiff, or does the PSLRA bar kick in so long as the securities fraud is actionable by anyone?

Before answering this question, the Court must first determine if the four Flynn-led schemes would be actionable as securities fraud by anyone.  This Court is not concerned that Lerner is engaging in "surgical" pleading -- after all, as Lerner points out, the government chose to indict Flynn on wire and mail fraud, not securities fraud, Pl.'s Opp'n Colman 21 -- but the approach used in several circuits would bar Lerner from relying upon these as predicate acts if anyone would have standing to bring these securities fraud claims.  See, e.g., MLSMK Inv. Co. v. JP Morgan Chase & Co., 651 F.3d 268, 278 (2d Cir. 2011).  Because of the concern over "surgical" pleading, the PLSRA exception applies regardless of whether the complaint contains the elements and technical requirements for pleading securities fraud, so long as the elements are evident from the pled facts.  Bald Eagle, 189 F.3d at 330.

"A typical 10b–5 securities fraud claim requires proof of:
(1) a material misrepresentation or omission; (2) scienter, or a
wrongful state of mind; (3) a connection with the purchase or
sale of a security; (4) reliance; (5) economic loss; and (6)
loss causation." Calderon Serra, 747 F.3d at 4 (internal
quotation marks omitted) (quoting Hill v. Gozani, 638 F.3d 40,
55 (1st Cir. 2011)).  For all four of the alleged Flynn-led
schemes, Colman has pled facts indicating that some party could
bring a claim that satisfies all six elements of 10b-5
securities fraud, though the third factor -- the connection to
the purchase or sale of a security -- requires some unpacking.
See Compl. ¶¶ 54-57, 169a-e, 171a (alleging misrepresentation,
scienter, reliance, loss, and loss causation for the DJF Fund
scheme); id. ¶¶ 67-69, 169d, 171b (Greenleaf Property scheme);
id. ¶¶ 78-86 (East Howard Street Property scheme); id. ¶¶ 88-94
(Patriot Investments scheme).

The Securities Exchange Act of 1934 defines a security as
any note, bond, investment contract, and so forth that allows
for participation in a profit-sharing enterprise (excluding
instruments that mature in excess of nine months).  15 U.S.C. §
78c(a)(10).  Congress defined securities in sufficiently broad
and general terms so as to include virtually any instrument that
may be sold as an investment.  Reves v. Ernst & Young, 494 U.S.
56, 60-61 (1990) (citing United Housing Found., Inc. v. Forman,

[24]

421 U.S. 837, 847-49 (1975)).  Determining whether an instrument is a security is a question of economic reality rather than form.  <u>Forman</u>, 421 U.S. at 851-52.  The federal securities laws govern fraud that occurs face to face as well as fraud in an organized market.  <u>Superintendent of Ins.</u> v. <u>Bankers Life & Casualty Co.</u>, 404 U.S. 6, 12 (1971).

The alleged fraud in the DJF Fund scheme is actionable (by someone) as securities fraud because it involves the type of security called an investment contract.  See <u>SEC</u> v. <u>W. J. Howey Co.</u>, 328 U.S. 293, 298-99 (1946). <u>Howey</u> explains that "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of a promoter or a third party."  <u>Id.</u>  In other words, the investor is "attracted solely by the prospects of a return on their investment."  <u>Id.</u> at 300.  In contrast, a real estate contract whose purpose is to allow an individual to buy property for commercial or personal use is not a security. <u>Forman</u>, 421 U.S. at 852-53.  Lerner labels the organization an "investment fund," and her description of it in the complaint indicates that participants pooled their assets expecting collectively to receive a return through the growth of their investments rather than because they were trying collectively to run a business out of the chosen properties.  See Compl. ¶ 51;

SEC v. SG Ltd., 265 F.3d 42, 50 (1st Cir. 2001) (noting that
Howey requires the existence of a common enterprise and holding
that "horizontal commonality" -- pooled assets of investors that
share in the profits and risk of an enterprise -- is the proper
test).

The other three schemes -- Greenleaf Property, East Howard
Street Property and Patriot Acquisition -- must be analyzed
under the standard from Reves that pertains to promissory notes,
since they do not involve solely the type of pooled investment
fraud alleged in the first scheme.  494 U.S. at 64-65.  There is
a presumption that such notes are securities, but this
presumption can be rebutted by a showing that they were issued
for the purpose of enabling commerce, rather than investment.
Id.  The test is whether such instruments bear a "family
resemblance" to non-securities, relying on four factors: whether
it was issued to generate investment profit rather than finance
commercial operations; whether the "plan of distribution"
indicates it is intended for speculation or investment; whether
a reasonable investor would consider it a security; and whether
another regulatory scheme significantly governs the transaction,
making application of the Securities Act unnecessary.  Id. at
66-67.

The first Reves factor leans in favor of finding these
schemes to involve securities because there is no indication

that the selling and buying of these properties were for
commercial purposes, and there are many indicia throughout the
complaint that these transactions were done for the purpose of
investment.  See, e.g., Compl. ¶¶ 58 (terming the victims of the
Greenleaf Property schemes "investors"), 67 (alleging Greenleaf
Property to be essentially a Ponzi scheme where money from
earlier investors was used to pay previous investors), 87
(referring to Patriot Acquisition as an "investment
opportunity"); see also Bald Eagle, 189 F.3d at 300 ("[C]onduct
undertaken to keep a securities fraud Ponzi scheme alive is
conduct undertaken in connection with the purchase and sale of
securities.").  The complaint is somewhat unclear as to whether
the East Howard Street Property transactions were for investment
or commercial use, but Lerner clarifies the issue by referring
to Brewster -- one of the buyers -- as an "investor" in her
Opposition.  Pl.'s Opp'n Colman 5.  Even if some of the
transactions were commercial or had commercial components, when
the scheme as a whole is intertwined with and supports
securities fraud then it is "in connection with the purchase or
sale of securities." Bald Eagle, 189 F.3d at 330.  The second
factor is not well-developed in the complaint, but the third
factor also points in favor of finding these transactions to be
securities: the Greenleaf Property and East Howard Street
Property schemes were done by and through DJFCO, Compl. ¶¶ 60,

70, and Flynn sold the Patriot Investments scheme as an investment opportunity, id. ¶ 88.   There is no countervailing regulatory regime that counsels against finding these transactions to be securities under the fourth factor.   On balance, all these alleged schemes are therefore actionable as securities under the "reverse 12(b)6 inquiry." Calderon Serra, 747 F.3d at 4.

As Lerner herself would not have standing to bring these claims because those schemes did not injure her, the next question is whether the PSLRA bars her reliance on these alleged schemes as predicate acts.   The Second Circuit conducted the most in-depth treatment of this question when it endorsed an actionable-by-anyone approach, ruling the PSLRA precluded the plaintiffs from bringing a RICO claim for aiding and abetting securities fraud, when they were statutorily barred from suing directly.   See MLSMK, 651 F.3d at 273-80 (ruling the section 1964(c) bar applies "even where a plaintiff cannot itself pursue a securities fraud action against the defendant").   The Ninth Circuit has also ruled that section 1964(c) bars any conduct actionable as securities fraud, regardless of the RICO plaintiff's standing to bring such a claim.   Howard v. Am. Online Inc., 208 F.3d 741, 749 (9th Cir. 2000), cert. denied, 531 U.S. 828, 121 (2000) (holding securities claims that "could be brought by a plaintiff with proper standing" were actionable

and therefore barred).  The majority of district courts considering the issue without clear guidance from their Circuits have following MLSMK in ruling that the PSLRA applies if any party would have standing to bring a claim.  See, e.g., Capital Inv. Funding, LLC v. Field, Civ. A. No. 6:13-2326, 2015 U.S. Dist. LEXIS 8206 *11 (S.C. Jan. 20, 2015); Amos v. Franklin Fin. Servs. Corp., Civ. No. 10-1285, 2011 U.S. Dist. LEXIS 134431 at *15 (M.D. Penn. Noc. 22, 2011).  In an unpublished opinion, the Eleventh Circuit has summarized this trend (without itself ruling on the standing issue): "courts have applied the RICO bar in § 1964(c) broadly, regardless of whether the plaintiff explicitly relied upon securities fraud as a predicate act or even had standing to pursue a securities fraud claim." Licht v. Watson, 567 Fed. Appx. 689, 693 (11th Cir. 2014).

Lerner urges this Court instead to adopt a narrower interpretation of section 1964(c).  Pl.'s Opp'n Colman 23 (citing Menzies v. Seyfarth Shaw LLP, 197 F. Supp. 3d 1076 (N.D. Ill. 2016), aff'd in part, 943 F.3d 328 (7th Cir. 2019) (affirming the district court's analysis of section 107 of the PSLRA)).  In Menzies, Judge Blakey looked closely at the language of the PSLRA exception:

> [A] plain reading of the phrase 'any conduct that
> would have been actionable' means conduct that: (1)
> injured a person's business or property (and is thus
> being relied upon by that person to establish a RICO
> violation); and (2) would have been actionable as

fraud in the purchase or sale of securities.  When
such injurious 'conduct' to the RICO 'person' could
also trigger an 'action' for remedies under the
securities laws, then it constitutes 'actionable'
conduct under the exception.  As such, the term
'actionable' conduct means injuries to the 'person'
that he could use to seek a remedy via a private
securities fraud action, or the same injurious conduct
to such person that could otherwise be remedied via a
public action filed by the SEC.

Menzies, 197 F. Supp. 3d. at 1107.  Securities fraud injuring

someone other than the RICO plaintiff is not "actionable" within

the meaning of the PSLRA exemption, Judge Blakey explained,

because "it does not relate to the 'conduct' being relied upon

by the 'person' bringing suit to address 'his' injury to

business or property."  Id.

Statutory interpretation begins with the language of the

statute.  United States v. Ron Pair Enters., 489 U.S. 235, 241

(1989); Stornaway Fin. Corp. v. Hill (In re Hill), 562 F.2d 29,

32 (1st Cir. 2009).  Extrinsic material such as legislative

history may be consulted to the extent it sheds light on the

Legislature's understanding of ambiguous terms.  Exxon Mobil

Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005).

This Court finds the statutory analysis in Menzies to be

perfectly plausible but disagrees that the text is so clear as

to be unambiguous.  Menzies places the weight of its analysis on

the grammatical connection of the word "actionable" to the

"person" who has been injured, but other courts have made an

equally plausible argument that "actionable" should be read on its own.  See, e.g., Howard, 208 F.3d at 749 (placing emphasis on whether "any conduct" is actionable); Tittle v. Enron Corp. (In re Enron Corp. Sec. Derivative & ERISA Litig.), 284 F. Supp. 2d 511, 620 (S.D. Tex. 2003) (noting the absence of explicit language connecting "actionable" to the person injured).

The First Circuit has looked in the past to legislative history to interpret another contested clause of the PSLRA, so this Court does so now.  See Greebel v. FTP Software, Inc., 194 F.3d 185, 195 (1st Cir. 1999).  The legislative history is not entirely clear, however.  The Second Circuit pointed out that the Conference Committee Report for section 107 of the PSLRA explained that Congress "'intend[ed]' that the section would 'eliminate securities fraud as a predicate offense in a civil RICO action'" and further noted that Congress's purpose was to "remove [as a predicate act of racketeering] any conduct that would have been actionable as fraud . . .'" MLSMK, 651 F.3d at 278-279 (quoting H.R. Rep. 104-369, at 47 (1995) (Conf. Rep.) and citing S. Rep. 104-98, at 19) (brackets and emphasis provided by Second Circuit).  MLSMK also emphasized that Congress was aware that the exception would remove some types of claims (including aiding and abetting claims, at issue in that case) from RICO liability, but that it concluded the securities

laws "generally provide adequate remedies for those injured by securities fraud." Id. (quoting S. Rep. 104-98, at 19).

Menzies expands this legislative history by looking to its "entirety." 197 F. Supp. 3d at 1114. What that analysis shows is that the final language of the PSLRA bill was the result of a series of compromises between members of Congress, some of whom favored a more expansive standard that would bar any predicate act that "involved" securities fraud, and others who saw such language as stripping injured investors of a remedy. Id. at 1112-14. The final compromise bill included both the current "any conduct that would be actionable" language and the "conviction exception" that allows for securities fraud to be used as a predicate act for parties who have been convicted. Id. at 1113. Judge Blakey characterizes this final bill as "narrower" in terms of the type of conduct covered than the initially proposed "involves" standard, which is clearly correct, but the legislative history he cites indicates that the battle lines were drawn over the span of fraud exempted by the bill, not over the "actionable-by-whom" standard at issue in this case. Id. at 1112-13. Overall, the courts have been able to cite general propositions in the congressional record that support their interpretation, but not a precise citation to the congressional record specifically addressing this exact issue. Compare id. at 1114 (quoting Securities Litigation Reform

Proposals S. 240, S. 667, and H.R. 1058: Hearings Before the
Subcomm. on Securities of the S. Comm. on Banking, Housing, and
Urban Affairs, 104th Cong. 251 (1995) (statement of Arthur
Levitt, Chairman of the SEC) (emphasizing the need to provide
adequate remedies), with MLSMK, 651 F.3d at 278-79 (quoting H.R.
Rep. 104-369, at 47) (noting congressional intent to eliminate
securities fraud as a predicate offense in a civil RICO action).

     All in all, the congressional record itself appears to be
ambiguous.  Perhaps this ambiguity was the result of Congress
not considering this precise pattern of facts, or perhaps it was
intentional.  If the latter, "at best there appears to have been
an agreement to disagree . . . and perhaps, as is common, to
leave such matters for courts to resolve." Greebel, 194 F.3d at
195.  On the current question, the majority of courts have
resolved the issue by ruling the PSLRA to be broadly preclusive
under the "actionable-by-anyone" standard, and this Court deems
their analysis persuasive.  See MLSMK, 651 F.3d 268.  The
countervailing position espoused by the district court in
Menzies is extremely thorough and thoughtful but ultimately does
not persuade this Court that the PSLRA bar is so limited.
Moreover, the Court observes that joining the majority position
has the benefit of increasing predictability and preventing
forum-shopping.  The Court rules that the PSLRA bars reliance on

[33]

the four Flynn-led schemes as predicate acts for Lerner's RICO claims since those schemes are actionable as securities claims.

One other matter requires attention in this context. The PLSRA "conviction exception" allows suits against persons like Flynn who have been convicted for fraud. See 18 U.S.C. § 1964(c); In re Enron Corp., 284 F. Supp. 2d at 623 (collecting cases). Courts have consistently held, however, that this exception is available only to the victims of the indicted conduct. See Kaplan v. S.A.C. Capital Advisors, L.P., 104 F. Supp. 3d 384, 389 (S.D.N.Y. 2015); Krear v. Malek, 961 F. Supp. 1065, 1076-78 (E.D. Mich. 1997). Lerner was not one of the victims in Flynn's schemes. See Flynn Indictment ¶¶ 6-14, 17-23. Thus, all of the alleged predicate acts related to the Solar Resources claim survive because Colman has not argued that those are actionable as securities fraud, but Lerner cannot use the four Flynn-led schemes as predicate acts.

### 2.   Count I: Violation of 18 U.S.C. section 1962(c)

What remains after applying the PSLRA exception are the claims related to the Solar Resources scheme. See Compl. ¶¶ 153-161. For purposes of analyzing the four elements of 1962(c), this Court will look only to the Solar Resources scheme for the "conduct" and "racketeering" elements, but will consider the facts alleged with respect to the Flynn-led scheme in determining if an "enterprise" exists. This is because the

PSLRA exception refers to any "conduct" actionable as fraud, a term of art in the RICO landscape referring to one of the four elements of a claim.  18 U.S.C. § 1964(c); Sedima, 473 U.S. at 496.  The "racketeering" element derives from the "conduct" element.  See id. at 495 (explaining that "'racketeering activity' consists of no more and no less than commission of a predicate act"); id. at 496 (holding that "the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern"); see also MLSMK, 651 F.3d at 278-79 ("Congress 'intend[ed]' that the section 'would eliminate securities fraud as a predicate offense in a civil RICO action . . . .'" (quoting H.R. Rep. 104-369, at 47) (alteration in original but emphasis added)).  The existence of an "enterprise," however, is a separate inquiry not based on any particular "conduct."  See United States v. Turkette, 452 U.S. 576, 580 (1981) ("The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages.").  The pattern element will be discussed below as the question of how it interacts with the PSLRA is complex and warrants separate treatment.

### a.    The Enterprise

Colman argues that Lerner has failed adequately to plead the existence of an association-in-fact enterprise because she

has failed to allege a connection between the Solar Resources scheme and the Flynn-led schemes. Colman Mem. 8-9. Since he did not manage DJFCO or any other entity Lerner accuses of wrongdoing, Colman reasons that this Court cannot consider him part of the alleged enterprise. Id. at 9 (citing Brennan v. Ferriera, 251 F. Supp. 3d 338, 342 (D. Mass. 2017)). Canavan similarly argues that the facts alleged in the complaint do not adequately allege criminal conduct, let alone conduct as part of an enterprise. Canavan Mem. 3-5. Lerner argues that these defendants, two attorneys, need not hold a formal managerial position in the enterprise to be considered participants if they are involved in its operation. Pl.'s Opp'n Colman 10 (citing Reves, 507 U.S. at 179). Here, a liberal reading of Colman's complaint indicates that she has sufficiently pled the association-in-fact elements of a RICO enterprise.

An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); Turkette, 452 U.S. at 583. An association-in-fact enterprise requires three features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle v. United States, 556 U.S. 938, 946 (2009). In order "'to conduct or participate,

directly or indirectly, in the conduct of such enterprise's affairs' one must participate in the operation or management of the enterprise itself." Reves, 507 U.S. at 185 (quoting 18 U.S.C. § 1962(c)); cf. United States v. Marino, 277 F.3d 11, 34 (1st Cir. 2002) ("The RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." (quoting United States v. Elliott, 571 F.2d 880, 903 (5th Cir. 1978))). The plaintiff must provide "evidence of an ongoing organization, formal or informal, and . . . evidence that the various associates function as a continuing unit." Turkette, 452 U.S. at 583.

Lerner alleges that Colman, Canavan, and Flynn formed the association-in-fact enterprise around 1999 for the purpose of "inducing investors to loan money to the enterprise under false pretenses and knowing the investors would not receive a return on their investments in order to obtain money not rightfully belonging to the enterprise." Compl. ¶¶ 155-157. She also claims that the enterprise existed "to illegally take control over Solar Resources, illegally increase the value of Solar Resources, and then sell it at a profit." Id. She claims that the three men have known each other since high school, id. ¶ 35, and that for a period of at least six years, both Canavan and DJFCO, which employed Colman as general counsel, did business at 1495 Hancock Street in Quincy. Id. ¶¶ 38-41. While it is not

plausible that the three men came together in 1999 to effect the latter half of this twofold common purpose -- the Solar Resources scheme -- Lerner sufficiently alleges they had a common purpose to defraud investors in other schemes, and that their enterprise was involved in Solar Resources.

Regarding the continuity and distinctness requirements, Boyle held that an enterprise requires "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." 556 U.S. at 946; see also United States v. Rodríguez-Torres, 939 F.3d 16, 24 (1st Cir. 2019) ("[T]here must also be evidence of 'interpersonal relationships' calculated to effect that purpose, i.e., evidence that the group members came together to advance 'a certain object' or 'engag[e] in a course of conduct.'") (alteration in original) (quoting Boyle, 556 U.S. at 946). Here, Lerner alleges that all three men participated in the Greenleaf Property, East Howard Street Property, and DJF Fund schemes, Compl. ¶¶ 58-86, and alleges Flynn and Colman's involvement in the Patriot Investments scheme. Id. ¶¶ 87-94. With respect to the Solar Resources scheme, Flynn and Canavan are named as recipients of the allegedly fraudulent stock transfers. Id. ¶¶ 95-104, 107, 109-110.[6] The use of DJFCO as

---

[6] Regarding each member's respective role in the alleged enterprise, Lerner alleges:

the hub for these schemes imposes an ascertainable structure on the actions of the three men, as it represents an enterprise distinct from the racketeering activity.  See Handeen v. Lemaire, 112 F.3d 1339, 1352 (8th Cir. 1997).[7]  In light of Flynn's indictment coupled with the allegations that Flynn, Canavan, and Colman worked in concert in the past, and the fact that Flynn and Canavan are beneficiaries of the stock transfer, it is plausible that the three men formed a continuing unit.

The inquiry into whether Colman, Canavan, and Flynn played a part in the operation or management of the enterprise is narrower.  Section 1962(c) imposes liability only upon individuals who conduct or participate in the enterprise's affairs "through" a pattern of racketeering activity.  18 U.S.C. § 1962(c).  Thus, the operation and management test from Reves, 507 U.S. at 185, is limited to an analysis of those actions that

---

"[E]ach of the defendants participated in the conduct of the criminal Enterprise: Colman drafted fraudulent legal documents and caused them to be sent by email and mail to investors, Flynn induced investors to loan the enterprise money through fraud, misrepresentation, and deceit as to how the funds would be used and the strength of the investments, and Canavan contributed legal real estate work and purchased property that was central to the schemes to defraud."

Compl. ¶ 172.

[7] Of course the Solar Resources scheme has no direct connection to DJFCO, but the overlap in personnel involved in the schemes allows the plausible inference that the continuing enterprise from the Flynn-led schemes existed there, as well.

can be considered part of the pattern of racketeering activity.
In this case that category encompasses only the Solar Resources
scheme.  As alleged in Lerner's complaint, Colman was the
ringleader of this portion of the scheme.  See Compl. ¶ 160.
The role of Colman and Flynn, as alleged, appears to be the
entirely passive reception of fraudulently acquired stock and
promissory notes.  See id. ¶¶ 109-110, 120-122, 136-137, 144-
145, 160a-b (mentioning Flynn's and Canavan's alleged
involvement without making any accusation that they took an
active role), id. ¶¶ 124-127, 130, 160 (accusing Colman alone of
causing the allegedly fraudulent transfers).  Without some
allegation that the two men aided Colman in executing the
scheme, this connection does not impose RICO liability.  Flynn
and Canavan had significantly less involvement than the outside
accounting firm in Brennan, which this Court did not consider
subject to enterprise liability, despite handling a RICO
enterprise's books and making false entries, since the firm did
not make decisions.  251 F. Supp. 3d at 342.

Therefore, while Lerner has properly alleged the existence
of an enterprise, the narrowing of available predicate acts
under the PSLRA means that she can bring RICO claims only
against Colman.

### b.    Pattern of Criminal Activity

Lerner alleges that Colman's various actions in advancing the Solar Resources scheme constituted multiple discrete predicate acts, and can themselves form a pattern of racketeering activity.  Compl. ¶¶ 159-160.[8]

To show that Colman engaged in a pattern of racketeering activity, Lerner must allege the commission of two or more predicate acts.  18 U.S.C. § 1961(5); H.J. Inc. 492 U.S. at 238; United States v. Cianci, 378 F.3d 71, 88 (1st Cir. 2004). "[W]hile two predicate acts are necessary to form a RICO 'pattern,' they may not be sufficient unless they are both 'related' and 'amount to or pose a threat of continued criminal activity.'"  Schultz v. Rhode Island Hosp. Tr. Nat'l Bank, N.A., 94 F.3d 721, 731 (1st Cir. 1996) (quoting H.J. Inc., 492 U.S. at 239); see also Apparel Art Int'l, Inc. v. Jacobson, 967 F.2d 720, 723 (1st Cir. 1992) (discussing the elusiveness of a working definition of a RICO "pattern").  To satisfy the relatedness requirement, the plaintiff must show that the predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise

---

[8] In her Opposition Lerner refers to the Solar Resources scheme as a single predicate act, along with each of the four Flynn-led schemes.  Colman Opp'n 13 ("[T]he Complaint alleges five separate predicate acts . . .").  This Court considers the use of the term "predicate act" in her Opposition merely to reflect the different focus of her argument, rather than an attempt to back-track on the complaint's allegation that the scheme itself was made of multiple predicate acts.

are interrelated by distinguishing characteristics and are not isolated events." H.J. Inc., 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e)).  To show a threat of continuing criminal activity, the plaintiff need not cite separate criminal "schemes" but must show that either the predicate acts together formed a continuous racket ("closed" continuity) or that they threaten future criminal acts ("open-ended" continuity).  Id. at 240-41.

Lerner alleges four viable types of predicate acts within the Solar Resources scheme.[9]  Separate from the primary scheme, she alleges that on January 7, 2008 Colman transferred 2,500 shares of stock to Flynn without authorization in violation of 18 U.S.C. § 2314 (the National Stolen Property Act) and 18 U.S.C. §§ 471-473 (counterfeiting securities).  Compl. ¶ 160a.[10] The second set of predicate acts is Colman's transfer of shares to himself, Flynn, Canavan, and the Colman family members in violation of the same provisions.  Id. ¶¶ 107, 160c-d.  The

_____

[9] Lerner does not explicitly number these actions, but whether this Court counts up each instance of separate mailings or views them collectively does not change the analysis.  See Menzies, 197 F. Supp. 3d at 1100 ("[T]he sheer number of mail or wire fraud acts alone does not, by itself, establish the requisite threat of continued criminal activity.").

[10] Her second allegation, that Colman issued promissory notes to Canavan without Bill Colman's authorization, does not qualify as a RICO predicate act because as pled it constitutes only a potential violation of fiduciary duty, which is not actionable under RICO.  See Compl. ¶ 160b; La Vay Corp. v. Dominion Fed. Sav. & Loan Ass'n, 830 F.2d 522, 529 (4th Cir. 1987).

third act is the mailing of the falsified water right assignment
to the Utah Division of Water Rights in violation of the mail
and wire fraud acts, and the fourth is the procurement of
Lerner's consent to the sale of Solar Resources through
fraudulent interstate communication.  Id. ¶¶ 160e-h.  These
predicate acts have the same victim -- Bill Colman or his estate
-- the same purpose of extracting value from Solar Resources,
and the same method of utilizing fraudulent or forged documents,
id. ¶¶ 126-127, 160, and therefore easily pass the relatedness
test.  H.J. Inc., 492 U.S. at 240.

### i. Closed Continuity

Colman argues that all of his alleged actions surrounding
the Solar Resources scheme are "related to a unitary goal" and
therefore cannot form a RICO pattern.  Colman Mem. 10.  Colman
is correct for the purpose of examining closed continuity.

The Supreme Court has "described continuity as 'both a
closed- and open-ended concept, referring either to a closed
period of repeated conduct, or to past conduct that by its
nature projects into the future with a threat of repetition.'"
Efron v. Embassy Suites (P.R.), Inc., 223 F.3d 12, 16 (1st Cir.
2000) (quoting H.J. Inc., 492 U.S. at 241).  A small number of
predicate acts committed over a "few weeks or months" do not
establish closed continuity, id. (quoting H.J. Inc., 492 U.S. at
242), but where the acts are so far-reaching and extend over

such a long time period that "common sense compels a conclusion
of continuity," then closed continuity exists, Giuliano v.
Fulton, 399 F.3d 381, 387 (1st Cir. 2005) (quoting Efron, 223
F.3d at 17).  When the time period lies somewhere in the middle
a court should look to other indicia, including whether the acts
amount to a single scheme, whether the scheme had multiple
victims, and whether it had the potential to last indefinitely
or was essentially finite.  Home Orthopedics Corp. v. Rodríguez,
781 F.3d 521, 529 (1st Cir. 2015).  The First Circuit has
explained that "RICO is not aimed at a single narrow criminal
episode, even if that single episode involves behavior that
amounts to several crimes."  Systems Mgmt., Inc. v. Loiselle,
303 F.3d 100, 105 (1st Cir. 2002) (internal citations omitted).

Here, all of the alleged acts occurred over a period of
four and one-half years (January 2008 to August 2012).  Compl. ¶
160.  This is not so long a period of time so as to
automatically qualify as "continuous."  Cf. Fleet Credit Corp.
v. Sion, 893 F.2d 441, 447 (1st Cir. 1990) (holding that 95
fraudulent mailings over a four and one-half year period
constituted closed continuity, but that if the number of
predicate acts had been "few" there would be no continuity).
Except for one disconnected act in 2008, all of the conduct was
committed over a short period of time, making the 2008
transaction a "sporadic" offshoot that does not weigh heavily in

the temporal analysis.  Id. (quoting H.J. Inc., 492 U.S. at 239).

The other indicia show that the Solar Resources scheme did not exhibit closed continuity.  The ur-example of a single scheme that would qualify comes from H.J. Inc., where the Supreme Court ruled that Northwestern Bell's alleged six-year campaign of bribery targeted at five Minnesota government officials, designed to secure favorable rates, exhibited closed continuity despite being a single "scheme."  492 U.S. at 250. The First Circuit has been reluctant to find closed continuity in single schemes of a more limited nature, however.  In Efron, the court ruled that a scheme consisting of numerous alleged instances of wire and mail fraud, all designed to drive up costs in the construction of a hotel in order to extract value, did not exhibit closed continuity because the scheme was limited to a single business venture.  223 F.3d at 19.  Similarly, in Giuliano the court ruled that a series of fraudulent mailings designed to gain control of a racetrack business venture were insufficient to establish closed continuity, as the fraud was limited to a single business with only one victim.  399 F.3d at 390 ("Our case law suggests that the commission of 16 predicate acts over a six-month period is inadequate to establish a closed-ended pattern of racketeering activity.").  Accord Home Orthopedics, 781 F.3d at 530; Systems Mgmt., 303 F.3d at 105-06.

The Solar Resources scheme -- viewed on its own -- targeted only a single business, had a very limited set of victims (Bill Colman and his estate), and had a finite end date.  It therefore does not exhibit the kind of closed continuity indicating a RICO pattern.

### b. Open-ended Continuity

Lerner argues that the Solar Resources forms a pattern with the Flynn-led schemes because, in all of them, the enterprise members diverted funds and assets in order to enrich themselves through the use of fraudulent or forged promissory notes and investment documents.  Pl.'s Opp'n Colman 14.  Though she argues that the five schemes together exhibit closed continuity, her allegations also suggest open-ended continuity by illustrating the enterprise's regular way of doing business.  H.J. Inc., 492 U.S. at 242.  This is true only when taking into account the four Flynn-led schemes, however, and the PSLRA exception bars this Court from considering them for the open-ended continuity analysis.

A plaintiff may demonstrate a "pattern" by showing a "threat" of future criminal activity, defined as "a realistic prospect of continuity over an open-ended period yet to come." Home Orthopedics 781 F.3d at 531 (quoting Feinstein v. Resolution Tr. Corp., 942 F.2d 34, 45 (1st Cir. 1991)).  "This approach necessitates a showing that the racketeering acts

themselves include a specific threat of repetition extending indefinitely into the future [or] . . . are part of an ongoing entity's regular way of doing business." Feinstein, 942 F.2d at 45 (alteration and omission in original) (citation and internal quotation marks omitted).  "The 'open-ended' approach . . . allows a plaintiff to state a claim without waiting for a long-term pattern to develop 'so long as the alleged racketeering acts themselves include a specific threat of repetition extending indefinitely into the future or are part of an ongoing entity's regular way of doing business.'" Rojas-Buscaglia v. Taburno-Vasarely, 39 F. Supp. 3d 208, 214 (D.P.R. 2014) (quoting Giuliano, 399 F.3d at 387).

Here, Lerner has alleged that Colman conducted the Solar Resources scheme through the use of fraudulent documents and forgeries, just as the enterprise allegedly conducted itself through the regular provision of falsified promissory notes and documents.  See Compl. ¶¶ 160, 169, 171; Bolivar v. Fit Int'l Group Corp., No. 12cv781 (PGG) (DF), 2017 U.S. Dist. LEXIS 39887, at *56 (S.D.N.Y. Mar. 16, 2017).  Flynn's subsequent arrest and conviction do not interrupt the open-ended continuity analysis, as this analysis examines events as they existed at the time of the predicate acts.  Heinrich v. Waiting Angels Adoption Servs., Inc., 668 F.3d 393, 410 (6th Cir. 2012).

The PSLRA, however, presents a roadblock to establishing

open-ended continuity.  The text of section 1964(c) states that a plaintiff may not rely on "any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962."  18 U.S.C. § 1964(c). Allowing Lerner to cite Colman's alleged involvement in the Flynn-led schemes to establish open-ended continuity would allow her to use "conduct" barred by the PSLRA to "establish a violation of section 1962."  As a general rule, a court may look beyond predicate acts to the totality of the circumstances in establishing open-ended continuity, see Heinrich, 668 F.3d at 410; United States v. Kaplan, 886 F.2d 536, 542 (2d Cir. 1989), but the plain language of the PSLRA creates an exception to the rule.  This interpretation comports with the case law.  For example, the Second Circuit in MLSMK stated that the PSLRA exception was designed "to prevent litigants from using artful pleading to boot-strap securities fraud cases into RICO cases, with their threat of treble damages."  651 F.3d at 274 (citation omitted).  Similarly, the district court in Krear, interpreting the PSLRA's "conviction exception," narrowed its application only to the victims of indicted conduct in part because allowing parties other than the victims to sue "would necessarily cause the 'conviction exception' to swallow the rule which prohibits civil RICO claims for securities fraud."  961 F. Supp. at 1076. Here, allowing Lerner to cite the conduct from the Flynn-led

[48]

schemes would let her "boot-strap" a limited and discrete case of fraud into a RICO claim, using securities fraud as the strap. This conflicts with the accepted broad interpretation of the PSLRA.

Without the Flynn-led schemes, the Solar Resources scheme does not exhibit open-ended continuity.  Accordingly, this Court must dismiss count I against Colman.

### 3.    Count III: Violation of 18 U.S.C. section 1962(d)

Lerner argues that, even if counts I and II are not viable, she still has a valid claim for RICO conspiracy under section 1962(d) because the existence of a conspiracy can be inferred by the conduct of the enterprise.  Pl.'s Opp'n Colman 17-18. Colman argues the opposite, that Lerner's failure to plead a viable cause of action renders her conspiracy claim null. Colman Mem. 12.

Colman is correct.  A plaintiff can bring a section 1964(d) conspiracy claim only if she has been injured by racketeering activity, so proof of conspiracy naturally requires the existence of a viable racketeering injury.  Beck, 529 U.S. at 507.  Section 1964(d) is not redundant due to other RICO provisions because "the conspiracy provision allows persons who are responsible for an injury, but did not actually participate in the injury-causing activity, to be held liable." Beck v. Prupis, 162 F.3d 1090, 1099 (11th Cir. 1998).  Here, as Lerner

does not have a viable racketeering claim, she also cannot bring a conspiracy claim.

### 4.   State Law Claims

The remaining state law claims do not give rise to federal question jurisdiction.  28 U.S.C. § 1331.  The Court declines to exercise supplemental jurisdiction over these claims.  <u>See</u> 28 U.S.C. § 1367(c); <u>Carlsbad Tech., Inc.</u> v. <u>HIF Bio, Inc.</u>, 556 U.S. 635, 639-40 (2009); <u>Lambert</u> v. <u>Fiorentini</u>, 949 F.3d 22, 29 (1st Cir. 2020). Accordingly, these claims are dismissed without prejudice to their refiling in the appropriate state court.

## III. CONCLUSION

The Defendants' motions to dismiss as to counts I-III is GRANTED, and Lerner's RICO claims are dismissed with prejudice. The Defendants' motion to dismiss counts IV-VI is also GRANTED, and these claims are dismissed without prejudice.

**SO ORDERED.**

<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
DISTRICT JUDGE
